**STATE**

v.

**Manuel TEXIEIRA.**

No. 2006–267–C.A.

Supreme Court of Rhode Island.

April 3, 2008.

Lauren Zurier, Esq., Providence, for Petitioner.

John A. MacFadyen, III, Providence, for Respondent.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

On February 16, 2006, a jury found the defendant, Manuel Texieira,[1] guilty of the first-degree murder of one Edgar Ortega.

On June 20 of that year, he was sentenced to the mandatory term of life imprisonment.

The defendant has appealed to this Court, contending: (1) that the trial justice erred in refusing to arrest the judgment of first-degree murder; (2) that the trial justice erred in denying defendant's motions for a judgment of acquittal; (3) that the trial justice erred in denying defendant's motion for a new trial; and (4) that the trial justice erred in denying defendant's motion to correct an illegal sentence.

For the reasons set forth herein, we affirm the judgment of the Superior Court.

### Facts and Travel[2]

In the early morning of August 31, 2003, a fight between two strangers began outside of a Providence nightclub. Several bystanders joined in, and the fight ended tragically—with Edgar Ortega being beaten and kicked to death in the course of the melee.

The events that led to this tragic death began on August 30, 2003, when Mr. Ortega and three of his friends, Rigoberto Gomez, Victor Alonzo, and Jonathan Peguero, decided to spend the evening at "The Keg Room," a Providence nightclub. The impetus for the fight occurred after they arrived at that nightclub[3] when a club patron, later identified as Jonas Chattelle, walked by and bumped Mr. Ortega from behind while he was dancing with a female friend. The two men stared at each other ominously, but apparently did not confront each other at that time.

1. We note that there are several different spellings of the defendant's name throughout the record. We have chosen to employ the spelling that appears in the indictment.

2. The facts narrated in the Facts and Travel section of this opinion were adduced from the testimony of the multiple witnesses who testified at trial.

3. The record indicates that Mr. Ortega and his three friends arrived at the nightclub between 11:30 p.m. and midnight.

Later in the evening, at approximately 2:00 a.m., as the club was closing, Mr. Ortega began to argue with Mr. Chattelle, saying, "[H]it me, hit me. I don't care that the bouncers are here." As they continued to verbally quarrel, some bouncers came over to the two men and attempted to separate them. Mr. Ortega struggled with the bouncers; the bouncers then physically ushered Mr. Ortega out of the nightclub. The bouncers also directed several other patrons out of the club through its back entrance.

Mr. Ortega met up with his friends outside of the club and warned them that they should "watch out because there might be [a fight]." Immediately after making that statement, Mr. Ortega saw Mr. Chattelle and they began to fight on the sidewalk in front of the club's entrance. One of Mr. Ortega's friends, Victor Alonzo, attempted to break up the fight, but Mr. Ortega refused to withdraw.

As the two men continued their physical confrontation, a sizeable crowd began to surround them. As the crowd grew in size and intensity, Mr. Gomez and Mr. Alonzo attempted to fend off the crowd; but, recognizing that it was an unfair fight (Mr. Ortega was a large man who stood over six feet tall and weighed over three hundred pounds, whereas Mr. Chattelle weighed only about 180 pounds), the crowd became rowdier, yelling at the two men. Mr. Gomez heard defendant, a friend of Mr. Chattelle's, say: "This is not going to be fair. This is not going to be fair. This is my boy. He's not going to go down like that. * * * This is not the way we do things." Kevin Powell, a bystander, heard Alberto Heredia further instigating the fight, proclaiming his allegiance to Mr. Chattelle over and over again.

Eventually, the fight between Mr. Chattelle and Mr. Ortega evolved into a melee involving friends of both men. At some

point, Mr. Ortega was brought down to the ground, at which time Mr. Heredia proceeded to hit and kick him in the abdominal area. Mr. Ortega attempted to get up and was on all fours; at that point, in the descriptive words of Mr. Powell, defendant "kicked Ortega in the face * * * [h]ard, like he was trying to kick [a football] thirty yards * * *." Mr. Powell, who did not know defendant or any of the other participants, then grabbed defendant from behind to calm him down and prevent him from becoming further involved in the fighting.

At that time, Mr. Ortega was struck in the head by a bottle, possibly thrown by Mr. Heredia. After being struck by the bottle, Mr. Ortega attempted to stand up, but he was "confused" and was moving like a "punch drunk boxer" and was "walking wobbly." It appears that at this point the police arrived and began to take action to disperse the crowd.

It is here that the several accounts of the events that transpired on the night of August 31, 2003 begin to diverge. According to Mr. Alonzo, he and Mr. Ortega attempted to flee the scene; however, they were spotted by Mr. Chattelle and several others, including defendant, and the fighting resumed. Mr. Alonzo testified that defendant attacked him and that he and defendant were "struggling" when he felt someone hit the back of his head. Mr. Alonzo then saw defendant run toward his friends, who were in a circle "kicking" Mr. Ortega. Mr. Alonzo testified that he saw defendant enter the circle, but that he could not see what, if anything, Mr. Texieira was doing.

Another friend of Mr. Ortega's, Rigoberto Gomez, testified that, during the second phase of the fight, he saw defendant, among others, kicking and stomping on Mr. Ortega. According to Mr. Gomez, he

witnessed defendant kick Mr. Ortega in the head "about three times."

Dylan Andrews,[4] a bystander who had been at the club and who did not know Mr. Ortega or any of the other individuals involved in the fight, testified that, as he was standing on the street conversing with a friend, he saw a tall white man (later suggested to be one Eric Landry) come over and say, with respect to Mr. Ortega, "[t]his is him." Mr. Landry then proceeded to punch Mr. Ortega in the head.

Mr. Andrews testified that he then saw Mr. Chattelle run from the middle of the street toward Mr. Ortega, swing at him, and then drive his shoulder into Mr. Ortega's head. Then, as Mr. Ortega was trying to grab Mr. Chattelle, he stepped off the curb, lost his balance and fell to his knees. At that point, Mr. Landry "went to go kick him and * * * grazed him." Mr. Heredia also "barely kicked him as well, nearly kicking his shoulder." Mr. Andrews then testified that he saw Mr. Texieira run approximately three to four steps and then kick Mr. Ortega in the face. Mr. Andrews stated that the noise was jarring and sounded "like [Mr. Ortega's] face broke." At that point, Mr. Ortega's head went back, his hands came off the ground, and he collapsed on the ground without further movement.

The police found Mr. Ortega unconscious, and medical aid was summoned. He was taken by ambulance to the hospital, but he was pronounced dead shortly thereafter.

Doctor Dorota Latuszynski, the Acting Chief Medical Examiner who performed the autopsy on Mr. Ortega, testified that Mr. Ortega suffered multiple blunt force traumas to the head and body. She identified a contusion and abrasions above the right eye and a further abrasion on the cheekbone. She also testified that Mr. Ortega had a black eye, hemorrhaging of the eye, and a laceration to the tissue that connects the lips with the gums. Mr. Ortega had additional contusions on his left shoulder and back, on his right hand and right elbow, as well as abrasions on his wrist, armpit, and knees. Doctor Latuszynski listed the cause of death as cerebral edema (swelling of the brain) and subarachnoid hemorrhage of the brain due to blunt force trauma.

Doctor Latuszynski testified that the external and internal injuries to Mr. Ortega's head which she observed were consistent with a blunt force trauma that could have been caused by punching and kicking. Although she was certain that Mr. Ortega's death was caused by the cerebral edema

4. Mr. Andrews was the only witness with no relationship to the participants in the melee who testified that Mr. Texieira kicked Mr. Ortega during the second phase of the fight.

According to the record, Mr. Andrews did not make a statement to the police on the night of August 31, 2003. Thereafter, Mr. Andrews spoke with a co-worker about what had transpired on the night of August 31, and she referred him to an attorney; that attorney happened to be representing Eric Landry, another man who had been charged in connection with the death of Mr. Ortega. Mr. Andrews testified that he met with that attorney some weeks after August 31, 2003, and it was at that time that he told the attorney his version of events. The attorney informed him that he would contact the police and that they would contact Mr. Andrews directly. When Mr. Andrews did not hear from the police, he assumed that they did not need his assistance.

According to Mr. Andrews, it was not until August of 2005 that he was contacted by the police. At that time, he met with a detective at the Providence Police Department and began to give his statement. Before he was able to complete his statement or identify the perpetrator from a photo lineup, the detective was called away and terminated the interview. On January 30, 2006, Mr. Andrews completed his statement to police. It was at that time that he identified defendant from a photo lineup.

and subarachnoid hemorrhage, she could not tell whether the damage to Mr. Ortega's head was inflicted by one strong blow or was the cumulative effect of many blows; she also could not state decisively which blow in particular, if any, was the lethal blow to the head.

On February 6, 2004, defendant, along with Alberto Heredia, Eric Landry, and Jonas Chattelle, was indicted for the murder of Mr. Ortega in violation of G.L. 1956 § 11–23–1.[5]

The defendant's jury trial commenced on February 8, 2006, and it continued for seven trial days. At the close of the prosecution's case, defense counsel moved for a judgment of acquittal, arguing that the evidence did not support a charge of first-degree murder. The trial justice found that there was sufficient evidence to support a finding of first-degree murder, and she denied the motion. Defense counsel renewed his motion for a judgment of acquittal at the close of defendant's case; the trial justice again denied the motion, ruling, as she had previously ruled, that the evidence was sufficient to support a finding of first-degree murder.

On February 15, 2006, the trial justice gave her instructions to the jury. In the course of those instructions, the trial justice, without any objection by defendant, instructed the jury to determine whether or not defendant was guilty of the first-degree murder of Mr. Ortega based upon one or more of three theories of liability. Those theories were: (1) guilt as a principal; (2) vicarious liability as a co-conspirator; and (3) guilt as an aider and abettor.[6] On February 16, 2006, the jury found defendant guilty of murder in the first degree.

On February 24, 2006, defendant filed: (1) a motion for a new trial pursuant to Rule 33 of the Rhode Island Superior Court Rules of Criminal Procedure and (2) a motion in arrest of judgment pursuant to Rule 34 of the Rhode Island Superior Court Rules of Criminal Procedure. Both motions questioned *inter alia* the sufficiency of the evidence with respect to the first-degree murder conviction. After a hearing on April 11, 2006, the trial justice denied both motions.

On June 20, 2006, the Superior Court sentenced defendant to the mandatory sentence of life imprisonment pursuant to § 11–23–2.[7] Eight days later defendant filed a motion to correct an illegal sentence pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure, and in support of that motion he renewed his argument that the evidence was not sufficient to support a conviction for first-degree murder. On July 18, 2006, the trial justice denied the Rule 35 motion for the same reasons that she had articulated in denying defendant's Rule 34 motion to arrest judgment. The defendant timely filed a notice of appeal.

In his appeal, defendant contends: (1) that the trial justice erred in refusing to arrest the judgment of first-degree murder; (2) that the trial justice erred in denying defendant's motions for a judgment of acquittal; (3) that the trial justice

---

5. Mr. Heredia stood trial in June of 2005 and was convicted of second-degree murder. Mr. Landry pled guilty to involuntary manslaughter in September of 2005. Following defendant's trial, Mr. Chattelle pled guilty to misdemeanor manslaughter.

6. In submitting the case for the jury's consideration, the trial justice provided it with a

general verdict form that both the prosecution and the defense were allowed to review in advance; significantly, neither party objected to the verdict form.

7. General Laws 1956 § 11–23–2 provides in pertinent part: "Every person guilty of murder in the first degree shall be imprisoned for life."

erred in denying defendant's motion for a new trial; and (4) that the trial justice erred in denying defendant's motion to correct an illegal sentence.

## Analysis

### I

### Motion to Arrest Judgment

On appeal, defendant argues that the trial justice erred in denying his motion to arrest judgment pursuant to Rule 34 of the Rhode Island Superior Court Rules of Criminal Procedure.

The defendant first argues that two of the three theories of liability that were presented to the jury in the instructions (namely, "aiding and abetting" and "vicarious liability") are not legally sufficient to support a verdict of first-degree murder.

With respect to the theory of aiding and abetting, defendant contends that the jury instructions[8] provided the jury with the opportunity to convict him of being an accessory before the fact, and he further contends that, since that offense was not charged separately in the indictment, the conviction is invalid. The defendant further alleges that entry of judgment for being an accessory before the fact requires that the principal have been convicted of the same degree of offense; in this case, however, defendant emphasizes, no other charged participant was convicted of murder in the first degree.

With respect to the vicarious liability theory, defendant argues that the plain language of § 11–23–1 precludes a conviction of first-degree murder predicated on a conspiracy theory. The defendant also notes that the indictment charged murder without specifying a degree or type, and on that basis he argues as follows: "Insofar as the state purported to charge first-degree conspiratorial murder (a crime on which it went to the jury and on which (by hypothesis) the verdict may have been premised), then it failed to state an offense under Rhode Island law."[9]

Finally, defendant contends that the Superior Court acted in excess of its jurisdiction when it entered a judgment of first-degree murder "on what may have been a verdict premised on conspiratorial liability." The defendant similarly argues that the court acted in excess of its jurisdiction when it entered a judgment of first-degree murder on the basis of a verdict that was possibly premised on a theory of aiding and abetting.

 Although we appreciate the creative nature of defendant's arguments concerning his motion to arrest judgment and the articulate manner in which they have been presented to us, defendant cannot rely on Rule 34 as the procedural mechanism for raising these arguments. Rule 34 provides two separate and independent bases upon which a motion to arrest judgment may be predicated. First, such a motion is appropriate "if the indictment, information, or complaint does not charge an offense." Second, the motion is proper "if the court was without jurisdiction of the offense charged." Rule 34 does not, however, "permit a defendant to obtain belated review of * * * challenges that could have and should have been raised during the course of the trial." *Cronan ex rel. State v. Cronan*, 774 A.2d 866, 878 (R.I.2001). By failing to raise any of these arguments at trial, defendant is precluded from as-

---

8. We note that defendant voiced no objections to the jury instructions at the time of trial.

9. The parenthetical words in the sentence from defendant's brief that is quoted in the text appears in that brief and were not inserted by us.

serting them for the first time in a post-trial motion to arrest judgment.

■ Furthermore, a motion for arrest of judgment must be decided on the "record," which in this instance includes only the indictment, the plea, the verdict and the sentence. *See United States v. Sisson,* 399 U.S. 267, 281–82, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970). For Rule 34 purposes, the "record" does not include the evidence offered at trial or the jury instructions. *See Sisson,* 399 U.S. at 281–82, 90 S.Ct. 2117; *see also Owens v. United States,* 58 F.2d 684, 684 (D.C.Cir.1932); 3 Charles Alan Wright, *Federal Practice and Procedure: Criminal 3d* § 571 (2004). In view of this limitation, defendant's Rule 34 arguments with respect to the aiding and abetting and vicarious liability theories fail because determination of those issues would require this Court to look at the jury instructions and thus to look beyond the "record."

■ With respect to defendant's argument that the Superior Court acted in excess of its jurisdiction when it entered a judgment of first-degree murder which was possibly based upon a theory of conspiratorial liability or upon a theory of aiding and abetting, we conclude that it is likewise unavailing. Rule 34 provides for arresting judgment if the court is "without jurisdiction"—that is, if the court is without subject matter jurisdiction. *See United States v. Smith,* 410 F.Supp. 1256, 1258 n. 1 (E.D.Pa.1976); *United States v. Figueroa,* 337 F.Supp. 645, 652 (S.D.N.Y. 1972) ("[T]he jurisdiction referred to in Rule 34 concerns subject matter jurisdiction * * *."); *see also* 3 Charles Alan Wright, *Federal Practice and Procedure: Criminal 3d* § 571 (2004).[10] There is no question that the Superior Court had jurisdiction over the instant case, because it clearly has original jurisdiction over murder cases pursuant to G.L. 1956 § 8–2–15.[11] We infer that, because it is clear that there was no lack of subject matter jurisdiction in this case, defendant has argued that the Superior Court acted "in excess of its jurisdiction." For the above-stated reasons, however, it is our judgment that such an argument does not fall within the parameters of Rule 34.

For these reasons, we affirm the denial of defendant's Rule 34 motion to arrest judgment.

## II

### Motion for a Judgment of Acquittal

On appeal, defendant contends that the trial justice erred in denying his motion for a judgment of acquittal with respect to the first-degree murder charge, which motion was authorized by Rule 29 of the Superior Court Rules of Criminal Procedure.

■ In reviewing a trial justice's decision with respect to a motion for a judgment of acquittal, this Court applies the same standard as that employed by the trial justice. *See State v. Day,* 925 A.2d 962, 974 (R.I.2007); *State v. Imbruglia,* 913 A.2d 1022, 1027 (R.I.2007). As such, we view the evidence in the light most favorable to the prosecution, giving full

---

10. We note that, unlike a claim of lack of subject matter jurisdiction, a claim that a trial court exceeded its jurisdiction is waivable. *See, e.g., Hartt v. Hartt,* 121 R.I. 220, 397 A.2d 518 (1979).

11. General Laws 1956 § 8–2–15 provides as follows:

"The superior court shall have original jurisdiction of all crimes, offenses, and misdemeanors, except as otherwise provided by law, and shall sentence all persons found guilty before it to the punishment prescribed by law. All indictments found by grand juries shall be returned into the court."

credibility to the prosecution's witnesses and drawing "all reasonable inferences consistent with guilt" from that evidence. *State v. Snow*, 670 A.2d 239, 243 (R.I. 1996); *see also Day*, 925 A.2d at 974; *Imbruglia*, 913 A.2d at 1027.

If the evidence, construed in the light most favorable to the prosecution, is insufficient to establish the defendant's guilt beyond a reasonable doubt, a motion for a judgment of acquittal should be granted. *Day*, 925 A.2d at 974. If, however, a reasonable juror could find the defendant guilty beyond a reasonable doubt, the motion should be denied. *Id.*

In the instant case, the trial justice applied the correct standards when she denied defendant's motion for a judgment of acquittal. She explained that the testimony of Mr. Powell and Mr. Andrews indicated that defendant was involved in two spatially distinct fight scenarios, in both of which he kicked Mr. Ortega in the head. She further pointed out that, in view of Mr. Andrews' testimony to the effect that Mr. Texieira ran several steps before kicking Mr. Ortega, the jury could infer that such conduct required intent and premeditation of more than just a mere moment.

In view of these considerations, the trial justice correctly concluded that the evidence presented was sufficient to sustain a guilty verdict beyond a reasonable doubt for first-degree murder, and she accordingly denied defendant's motion for a judgment of acquittal. We conclude that there was no error in the trial justice's analysis or in her ultimate decision with respect to defendant's motion for a judgment of acquittal.

### III

### Motion for a New Trial

On appeal, defendant argues that the trial justice erred in denying his motion for a new trial, which he timely filed pursuant to Rule 33. He contends that the trial justice (1) incorrectly determined that the evidence supported a conviction for first-degree murder and (2) articulated and applied an incorrect legal standard in the course of finding that there was sufficient credible evidence to support a first-degree murder conviction.

When considering whether or not to grant or deny a motion for a new trial, "the trial justice acts as a thirteenth juror." *Imbruglia*, 913 A.2d at 1028 (internal quotation marks omitted); *see also State v. Woods*, 936 A.2d 195, 197 (R.I. 2007); *State v. Abreu*, 899 A.2d 473, 477 (R.I.2006). In dealing with a motion for a new trial, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Morales*, 895 A.2d 114, 121 (R.I.2006). If the trial justice concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did, the verdict should be affirmed and the motion for a new trial denied. *Day*, 925 A.2d at 984; *Imbruglia*, 913 A.2d at 1028. If the trial justice does not agree with the jury's verdict, "the trial justice must * * * determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict does meet this standard, the trial justice may grant a new trial." *State v. Banach*, 648 A.2d 1363, 1367 n. 1 (R.I.1994); *see also State v. Mondesir*, 891 A.2d 856, 862 n. 3 (R.I. 2006).

On review, we accord great weight to a trial justice's ruling on a mo-

tion for a new trial if he or she has articulated sufficient reasoning in support of the ruling. *See Woods,* 936 A.2d at 197; *Day,* 925 A.2d at 983–84; *Imbruglia,* 913 A.2d at 1028; *State v. Hallenbeck,* 878 A.2d 992, 1011 (R.I.2005). This Court will not overturn a trial justice's determination with regard to such a motion unless we determine that the trial justice committed clear error or that he or she "overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." *State v. Bolduc,* 822 A.2d 184, 187 (R.I.2003).

We employ this deferential standard of review with respect to a motion for a new trial because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses. In contrast to both the trial justice and the jury, the members of this Court do not observe witnesses while they testify and thus are unable to focus on the demeanor and body language of the various participants in a trial. *See, e.g., Woods,* 936 A.2d at 198 ("We do not have the same vantage point as the presiding judge, and we are unable to assess the witness' demeanor, tone of voice, and body language."); *Commonwealth v. Heffernan,* 350 Mass. 48, 213 N.E.2d 399, 403 (1966).

### A

### Causation

■ The defendant contends that the trial justice misconceived the testimony of the Assistant Medical Examiner in denying his motion for a new trial. The defendant argues that the evidence must support a finding that defendant contributed to Mr. Ortega's death and that the medical testimony precluded such a finding because the Assistant Medical Examiner could not determine whether the fatal injuries occurred as the result of a single blow

or more than one blow. We disagree with defendant's contention in this regard.

The trial justice correctly determined that there was sufficient evidence to support a jury finding that defendant committed first-degree murder. She pointed to the evidence indicating that defendant had delivered at least two forceful kicks to Mr. Ortega's head. She also pointed to the testimony of the Assistant Medical Examiner that the injuries she observed were consistent with being punched and kicked and that the cause of death was such blunt force trauma. We conclude that the trial justice did not misconceive the evidence when she found that the evidence was sufficient to support a conviction for first-degree murder. *See Holsemback v. State,* 443 So.2d 1371, 1382 (Ala.Crim.App.1983) ("To render a defendant guilty, it is not necessary that the blow given by him, or his wrongful act, was the sole cause of death. Even if the blow or act was only a partial cause accelerating death, the defendant is nevertheless guilty."); *People v. Bailey,* 451 Mich. 657, 549 N.W.2d 325, 334 (1996) ("In assessing criminal liability for some harm, it is not necessary that the party convicted of a crime be the sole cause of that harm, only that he be a contributory cause that was a substantial factor in producing the harm.").

### B

### Applicable Legal Standard

The defendant further asserts that, in denying the motion for a new trial, the trial justice incorrectly articulated the criteria as to what constitutes first-degree murder and erroneously used the criteria relative to second-degree murder in assessing the motion for a new trial with respect to the issue of first-degree murder. In essence, defendant contends that the trial justice conflated the first-degree mur-

der standard and the second-degree murder standard. Therefore, defendant argues, "the first-degree verdict here was sustained on a fundamentally inaccurate view of the requirements of law."

■ General Laws 1956 § 11–23–1, defines murder as "[t]he unlawful killing of a human being with malice aforethought." Pursuant to that same statute, first-degree murder is defined as "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing * * *." [12] Any other murder constitutes second-degree murder. In other words, murder in the second-degree "is any killing of a human being committed with malice aforethought that is not defined by statute as first-degree murder." *State v. Parkhurst*, 706 A.2d 412, 421 (R.I.1998); *see also State v. Mattatall*, 603 A.2d 1098, 1106 (R.I.1992).

■ This Court has defined malice aforethought as being synonymous with malice, either express or implied. "Legal malice can arise from either an express intent to kill or to inflict great bodily harm or from a hardness of the heart, cruelty, wickedness of disposition, recklessness of consequence, and a mind dispassionate of social duty." *State v. McGranahan*, 415 A.2d 1298, 1302 (R.I.1980); *see also State v. Lambert*, 705 A.2d 957, 964 (R.I.1997). Malice aforethought "consists of an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life."

*McGranahan*, 415 A.2d at 1302; *see also Parkhurst*, 706 A.2d at 421.

■ While malice aforethought is a required element with respect to both first-and second-degree murder, it is well-settled in this jurisdiction that "[t]he distinction between murder in the first degree and murder in the second degree is that murder in the first degree requires premeditation." *State v. Vorgvongsa*, 692 A.2d 1194, 1196 (R.I.1997); *see also State v. Grabowski*, 644 A.2d 1282, 1285 (R.I. 1994). The premeditation required for first-degree murder requires the formation of "an intent to kill for a period more than momentarily prior to the killing itself." *Id.* First degree murder "requires the state to prove beyond a reasonable doubt a premeditated intent to kill of more than a momentary duration in the mind of the accused * * *." *Parkhurst*, 706 A.2d at 421.[13]

In the instant case, we are satisfied that the trial justice independently evaluated the evidence and weighed the credibility of the witnesses; we are also satisfied that she acted conscientiously and meticulously in making her findings of fact and conclusions of law.[14] In addition, in denying defendant's motion for a new trial the trial justice adequately articulated her reasons for finding that there was sufficient evidence to convict defendant of first-degree murder. The record indicates that the trial justice would have decided the case as the jury did since, in her opinion, the

12. Section 11–23–1 also provides that any murder committed during the commission of certain enumerated felonies constitutes murder in the first-degree. None of those statutory provisions has any bearing on the instant case.

13. By contrast, in order to convict a person of murder in the second degree, it is only required that the state prove beyond a reason-able doubt that the defendant acted with malice. *See State v. Barrett*, 768 A.2d 929, 944 (R.I.2001); *State v. Banach*, 648 A.2d 1363, 1368 (R.I.1994).

14. We note that more than twenty transcript pages were required for the recording of the trial justice's findings of fact and conclusions of law.

prosecution proved the required elements of first-degree murder.

In the course of denying defendant's motion for a new trial, the trial justice found that the witnesses for the prosecution portrayed the defendant "as a person of great violence [who had] a total disregard for the sanctity of human life." The trial justice found the witnesses for the prosecution to be credible and observed that they provided a reliable version of the events that led to Mr. Ortega's death. She further found that Mr. Andrews and Mr. Powell provided especially credible and compelling testimony; in that regard, she noted that these two men had no connection to the decedent, the defendant, or any of the other participants in the fight.

In finding sufficient evidence to support a conviction for first-degree murder, the trial justice made the requisite finding of premeditation, stating that defendant's actions "were planned for more than a fleeting moment" and "resulted from more than just a fleeting or momentary thought." In connection with her finding of premeditation, the trial justice further found that the defendant acted with malice aforethought. Noting that "[i]t sounded like his face broke," the trial justice stated:

> "There was sufficient evidence [Texieira] acted deliberately and purposely; that he acted with wanton disregard for the probability of death or great bodily harm. When you consider * * * the fighting words, followed by two brutal kicks to the head of a man who was down, it is clear that the facts and circumstances give rise to a reasonable

inference that [Texieira] intended his kicks and intended to kill * * *."

For these reasons, the trial justice correctly denied defendant's motion for new trial.

## IV

### Motion to Correct an Illegal Sentence[15]

■■■ Finally, defendant contends on appeal that the trial justice erred in denying his motion to correct an illegal sentence because, as defendant's brief contends, "the mandatory life sentence imposed * * * may have been predicated on jury findings, which as a matter of law, support only the lesser offense of murder in the second degree." We note that this argument, which in essence questions the evidentiary basis for the jury verdict that was actually rendered, is not appropriately made in the context of a motion to correct "an illegal sentence" under Rule 35. While Rule 35 authorizes the correction of an illegal sentence at any time, it is important to bear in mind that an illegal sentence has been judicially defined as one that is not authorized by the statute establishing the punishment that may be imposed for the particular crime or crimes.[16] *See, e.g., State v. Murray*, 788 A.2d 1154, 1155 (R.I.2001) (mem.).

On appeal, the defendant had the burden of establishing that his life sentence for first-degree murder was not authorized by § 11–23–2. *See Murray*, 788 A.2d at 1155; *State v. Furtado*, 774 A.2d 38, 39 (R.I.2001). Pursuant to that statute, however, the *only* sentence permitted following a conviction for first-degree murder is life imprisonment; a trial justice in such a

---

15. It is questionable whether defendant has properly appealed from the denial of his motion to correct an illegal sentence. In any event, we now proceed to address his contentions with respect to sentencing.

16. The Reporter's Notes accompanying Rule 35(a) of the Superior Court Rules of Criminal Procedure define an illegal sentence as being "one which has been imposed after a valid conviction but is not authorized under law."

situation has absolutely *no discretion* with respect to the sentence since the statute proscribes that "[e]very person guilty of murder in the first degree *shall* be imprisoned for life." (Emphasis added.) In light of this mandatory statutory language, we conclude that the defendant has utterly failed to establish that the imposition of a life sentence was improper in the instant case. Accordingly, we affirm the trial court's denial of the defendant's motion to correct an illegal sentence.

### Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court. The papers in the case may be remanded to the Superior Court.