Issued May 31, 2017 Amended June 1, 2017

**Supreme Court**

No. 2015-370-C.A.

(P2/14-1420A)

State                                  :

    v.                                 :

Keith J. Pittman.                      :


NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State        :

v.         :

Keith J. Pittman.    :

Present:  Suttell, C.J., Goldberg, Robinson, Flaherty, and Indeglia, JJ.

# O P I N I O N

**Chief Justice Suttell, for the Court.**  A robbery on the streets of Providence led to a thief's short-term possession of stolen goods but long-term period of incarceration.  The defendant, Keith J. Pittman, appeals from his conviction by a jury of second-degree robbery, for which he was given a twenty-year sentence with sixteen years to serve at the Adult Correctional Institutions (ACI) and four years suspended with probation.  This case came before the Supreme Court, sitting at Woonsocket High School, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On January 17, 2013, after leaving work for the day, Ryan Laughlin and his roommate, Kyle Nichols-Schmolze, left their Chestnut Street office in downtown Providence and began walking home.  Laughlin testified that they left in the early evening because it was "definitely

* * * starting to get dark out but not fully dark." Laughlin explained that he and his roommate walked across the Point Street Bridge and proceeded up Wickenden Street. According to Laughlin, he "was carrying a messenger bag with a laptop; and [Nichols-Schmolze] [also] had a backpack with his laptop * * * [and] other work supplies." Laughlin testified that, while walking "somewhere near * * * Pizza Pie-er" on Wickenden Street, "two men stepped out from an alleyway" and grabbed him.

Laughlin continued to testify that "somebody" came from behind, "grabbed ahold of [him] and grabbed ahold of [his] bag and said, 'Give me your bag. I've got a gun.'" He began "taking off [his] bag" because he was "afraid" and did not "know [what was] going to happen." Laughlin testified that "the guy took [his] bag [from] over [his] head" when Nichols-Schmolze, standing "a couple of steps" away, said to the man, "You don't have a gun," to which the man repeated, "I have a gun." Laughlin described the man who took the bag from him as "a black guy" in his mid to late thirties;[1] he did not get as good a look at the second man, however. Laughlin testified that, as the two men ran off with his bag towards the Point Street Bridge, Nichols-Schmolze gave chase closely behind them, with Laughlin about twenty to thirty feet behind Nichols-Schmolze.

Nichols-Schmolze's testimony at trial essentially corroborated Laughlin's version of the incident. He described the two suspects, however, as "a white male and a black male[,]" stating that "[t]he black male was the one threatening that he had a gun" and "basically arresting [Laughlin], trying to peel the messenger bag over his head and pull it off."

Nichols-Schmolze continued to testify that, when the men started running, he realized that it appeared "very unlikely" that they had a firearm, and he started chasing after them. He

---

[1] At trial, Laughlin described the man as "pretty average;" not "noticeably tall or short or fat or thin, kind of like an average guy, probably 5'10", 6 feet, * * * and average weight."

said that, "[a]fter [running] the first block, the white male peeled off into a driveway[.]"[2] Nichols-Schmolze continued to pursue the man with the bag, who was "turning corners around the block." After one of the corners, the man "turned left down a driveway" and out of Nichols-Schmolze's sight. Nichols-Schmolze testified that he then "slowly walked and kept [his] distance from the corner" of the house, where he "assumed" the man with the bag was hiding. As he "rounded the corner" of the house, he saw the man in a driveway "leaning up against the house holding the bag," near "an overhead light." Nichols-Schmolze testified that he was ten feet from the man with the bag, and could see his face clearly, in what "could have been five seconds, [or] it could have been [fifteen]."

According to Nichols-Schmolze, the man then "threw the bag towards [him] and it landed at [his] feet[,]" and then the man "started jogging out [of] the driveway and back towards * * * where the original incident had happened." Nichols-Schmolze followed the man, encountering Laughlin on the way. Nichols-Schmolze said that he handed Laughlin the bag and told him to ensure that his belongings were not missing. Nichols-Schmolze testified that, after encountering Laughlin, the black male was "trailing" him and kept threatening that he still had a gun.

Nichols-Schmolze said he saw the man "get out a set of keys" and get into a silver sedan. At trial, Nichols-Schmolze could not recall the license plate number, but he testified that he "screamed the license plate number out loud" and he heard Laughlin, who was on the phone with 911 at the time, relay the number to the 911 dispatcher.[3] The man then drove off.

Providence Police Det. Charles Matracia testified that he was assigned to investigate the robbery "shortly after the incident occurred." Detective Matracia indicated that the license plate

---

[2] Nichols-Schmolze testified that he "did not [continue] pursu[ing] [the white male] because he didn't have the bag."

[3] The 911 recording was proffered at trial, in which Laughlin informs the dispatcher that the man drove off in a "silver" car, license plate number "675 063."

number was entered into the Division of Motor Vehicles database and that the registration "came back to a Dena Magiera," owner of a silver Nissan.[4]  Magiera's information was then entered into a police database, where it was discovered that defendant was "involved with that registration"—particularly, that Magiera and defendant were in a "domestic relationship." Detective Matracia testified that he pulled a picture of defendant, placed it into a photo array, and showed it to the roommates.[5]

The day after the robbery, according to Det. Matracia, he met with Nichols-Schmolze to review the photo array.  Detective Matracia testified that, before he showed Nichols-Schmolze any photos, Nichols-Schmolze read a "photo lineup instruction sheet," which he signed and dated.  Detective Matracia testified that, "when it came to [defendant's picture], [Nichols-Schmolze] immediately recognized that photograph, stating that that was the person that robbed him."[6]  A few days later, Laughlin was shown the photo array, but was "unable to identify anyone."

The defendant was arraigned on March 28, 2013, on charges of second-degree robbery in violation of G.L. 1956 § 11-39-1(b).  A two-day trial commenced in the Superior Court on July 8, 2015, after which a jury found defendant guilty as charged.  On September 3, 2015,

---

[4] Magiera also testified at trial.  She testified that she "was in a relationship with" defendant for two years.  In addition, she also testified that she owned a silver 2008 Nissan Altima, license plate number 675 063, which defendant used "like every day" and to which he had access on the day of the robbery.

[5] Detective Matracia clarified at trial that he assembled the photo array according to normal procedure; that is, taking the suspect's information and characteristics, entering it into the police database, which would yield a number of photographs of persons matching the suspect's characteristics.  Those photographs are then assembled along with the suspect's picture to create a photo array.

[6] Nichols-Schmolze testified that, when he identified defendant, he provided a "disclaimer" that "it seems hard, if not impossible, to be a hundred percent confident that you [could] correctly identify a picture of someone * * * based on a relatively brief interaction * * *."  Nonetheless, he indicated that he was "pretty confident" in his identification.

defendant's motion for a new trial was heard and denied. The trial justice then imposed a twenty-year sentence with sixteen years to serve at the ACI, four years suspended with probation upon release. The defendant timely appealed.

## II

## Standard of Review

On a motion for a new trial, this Court "will not disturb a trial justice's decision * * * unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." State v. Williams, 137 A.3d 682, 686 (R.I. 2016) (quoting State v. Mendez, 116 A.3d 228, 247 (R.I. 2015)). "We employ this deferential standard of review with respect to a motion for a new trial because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." State v. Texieira, 944 A.2d 132, 141 (R.I. 2008).

## III

## Discussion

## Motion for a New Trial

On appeal, defendant takes issue with the trial justice's denial of his motion for a new trial. Specifically, defendant contends that the trial justice "overlooked and misconceived material evidence" in denying his motion, and that the verdict "went against the fair preponderance of the evidence"; thus, failing to do "substantial justice."

Rule 33 of the Superior Court Rules of Criminal Procedure provides, in pertinent part, that "the court may grant a new trial to [a] defendant if required in the interest of justice."

"When a trial justice considers whether a verdict is against the weight of the evidence, he or she 'acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.'" Mendez, 116 A.3d at 246 (quoting State v. Barrios, 88 A.3d 1123, 1128 (R.I. 2014)). In so doing, the trial justice must "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting State v. Silva, 84 A.3d 411, 416 (R.I. 2014)). "If the trial justice agrees with the jury's verdict or determines that reasonable minds could disagree about the outcome, then he or she must deny the new-trial motion * * *." Williams, 137 A.3d at 686 (quoting State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011)). "If the trial justice does not agree with the jury's verdict, 'the trial justice must * * * determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice.'" Texieira, 944 A.2d at 140 (quoting State v. Banach, 648 A.2d 1363, 1367 n.1 (R.I. 1994)).

In support of his appellate argument, defendant notes that he was identified only by Nichols-Schmolze, "who candidly testified that" he was not "a hundred percent confident" that the photograph he had selected from the photo array was that of the man who had robbed his roommate. Further, defendant notes that Nichols-Schmolze's identification of the robber was based primarily upon his observation of the man for at most fifteen seconds on a dark night, during which brief period the man threw the bag at Nichols-Schmolze, who "immediately began checking the bag's contents," thereby distracting his focus.

In denying defendant's motion, the trial justice found "that there was more than sufficient evidence" to support the conviction. The trial justice began his analysis by stating that Nichols-Schmolze and Laughlin were "impressive * * * and spoke credibly [and] forthrightly about their

experience with * * * defendant." The trial justice noted that Laughlin "testified directly as to the fact that he didn't have the same look at * * * defendant as * * * Nichols-Schmolze did," but that Nichols-Schmolze was "unhesitant in identifying * * * defendant" and testified that he "got a good look at [defendant] when he stopped at a driveway where * * * defendant was standing under a light, [and] he could see who [defendant] was."

Further, the trial justice pointed to the fact that Nichols-Schmolze "had the presence of mind during the chase to relay the license plate numbers of the car that * * * defendant was driving * * * and that license plate came back to * * * defendant's partner at the time, * * * Magiera, who identified * * * defendant and stated that he did have access to the car." Furthermore, the trial justice also noted that Nichols-Schmolze "identified [defendant] within one or two days when the photo array was shown to him without any hesitation whatsoever."[7]

In his conclusion, the trial justice pronounced that "the evidence that the [c]ourt heard provided more than sufficient evidence to find beyond a reasonable doubt that the defendant did commit the crime of second degree robbery * * *." We are of the opinion that the trial justice did not overlook or misconceive any material evidence relating to the testimony proffered by the state, nor did he commit clear error in denying the defendant's motion for a new trial.

---

[7] Although the trial justice did not address Nichols-Schmolze's forthright acknowledgment that he could not be one hundred percent confident that the photograph he selected was that of the man he saw in the driveway, we are satisfied that the trial justice did not thereby overlook material evidence. The witness was merely stating the obvious when he said, "there's no way I can know for sure[.]" He went on to say, however, "but looking at these pictures, pretty quickly obvious, * * * I recognize this guy, so I said I'm pretty confident but I can't be a hundred percent sure." Moreover, Nichols-Schmolze made an unequivocal in-court identification of defendant.

## IV

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court and return the record of this case thereto.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Keith J. Pittman. |
| **Case Number** | No. 2015-370-C.A. (P2/14-1420A) |
| **Date Opinion Filed** | May 31, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Flaherty, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Luis M. Matos |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of Attorney General<br><br>For Defendant:<br><br>Megan F. Jackson<br>Office of the Public Defender |