STATE

v.

**Heriberto ROSARIO.**

No. 2009–110–C.A.

Supreme Court of Rhode Island.

Jan. 24, 2012.

939

Virginia M. McGinn, Department of Attorney General, for State.

Catherine Gibran, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON, for the Court.

The defendant, Heriberto Rosario, appeals from a judgment of conviction on two counts of first-degree child molestation.

On appeal, the defendant argues that the trial justice erred in failing to grant his motion for a new trial. For the reasons set forth below, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

The complaining witness, Joan,[1] was born on October 21, 1993. In late May of 2007, when she was thirteen years old, Joan approached Ellen Albanese, a guidance counselor at her school. During their conversation, Joan revealed to Ms. Albanese that she had had sexual intercourse with a man whom she had met through the internet and who was twenty-three years old. Although Joan initially would not reveal the name of the man with whom she said she had sexual intercourse, the ensuing police investigation concluded that it was with defendant that she had engaged in the two alleged instances of sexual intercourse.

On August 30, 2007, a grand jury issued an indictment that charged defendant with two counts of first-degree child molesta-tion in violation of G.L.1956 §§ 11–37–8.1 and 11–37–8.2.[2]

A jury trial was held in Providence County Superior Court over several days in mid-October of 2008. The state presented the following five witnesses: Joan, her sister (Jane), Ms. Albanese, Dr. Christine Barron (an expert in pediatrics and in child abuse and neglect), and Detective Douglas Allin (the detective assigned to investigate Joan's allegations). For his part, defendant opted to testify in his own behalf.

We summarize below the trial testimony that is relevant to the sole issue raised on appeal—*viz.*, whether the trial justice erred in denying defendant's motion for a new trial.

## A

## The Testimony of Joan

At trial, Joan testified that she first became acquainted with defendant[3] in January of 2007 through her slightly older sister, Jane, who was then fourteen years old. Joan testified that Jane had first begun communicating with defendant on the social network website called "Mi-Gente."[4] Joan further testified that Jane

---

1. In order to respect the privacy of the complaining witness and that of her family, we have used pseudonyms in referring to the complaining witness and to her sister. *See* G.L.1956 § 11–37–8.5. We refer to the complaining witness as "Joan" and to her sister as "Jane."

2. Section 1956 § 11–37–8.1 states that "[a] person is guilty of first degree child molestation sexual assault if he or she engages in sexual penetration with a person fourteen (14) years of age or under."
   Section 1956 § 11–37–1(8) defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, and anal intercourse, or any other intrusion, however slight, by any part of a person's body or by any object into the genital or anal openings of another person's body, or the victim's own body upon the accused's instruction * * *."

3. Throughout the trial testimony of Joan and Jane, defendant is referred to as "Manny"—the name by which both sisters knew him. During the trial and in response to the prosecutor's questions, the sisters testified that defendant was the person whom they knew as "Manny." On cross-examination, defendant similarly testified that he had used the name "Manny" when communicating with people online.

4. MiGente.com describes itself as being the "largest Latino–American community on-line." MiGente.com offers a variety of features to its users, including "music, jobs, forums, chat, photos, personals and groups[,]" all targeted to the specific interests of the [L]atino-[A]merican community." *Mi-Gente.com*, http://www.migente.com/ (last visited Jan. 23, 2012). (MiGente).

told her that she (Jane) and defendant "were supposedly going out." Joan stated that her own first interaction with defendant occurred when she "said hi to him once" while her sister was using a speakerphone during a telephone conversation with defendant in January of 2007.

Joan proceeded to testify that her first opportunity to communicate more extensively with defendant was on a particular day in April of 2007; on that day, while she had her sister's cell phone, Joan read a text message that defendant had sent to her sister. Joan testified that, when she saw that text message, she responded to defendant and explained that it was she who had received the text message, and not her sister. Joan further testified that defendant began asking her questions, including what her name was and how old she was. Joan testified that she told him her name and also told him that she "was in middle school" and was thirteen years old.

Joan further testified that defendant also asked her how old her sister (Jane) was; Joan added that defendant told her that Jane had informed him that "she was 25 and [that] she had four kids." Joan responded to defendant's inquiry about Jane by telling him Jane's true age, which was fourteen. Joan testified that, after she informed defendant of her sister's actual age, he no longer wanted to speak with Jane.

It was Joan's further testimony that she continued to exchange text messages with defendant for approximately another month and a half; she added that, at some point, the tone of the conversations changed. Joan testified that defendant began to tell her that "he wanted to get with [her] and, supposedly, he wanted to have sex with [her]." Joan stated that the conversations with defendant about having sex together lasted about three weeks.

Joan further testified that in May of 2007 she and defendant made a plan for him to come to the house in Providence where she lived with her sister and her grandparents.[5] Joan stated that defendant did in fact come over to the house at approximately 11 p.m. on May 4. She testified that her sister opened the door to the house for him while she remained in her bedroom, which was located in the basement of the house. Joan testified that defendant then came into her bedroom and that, other than saying "hi" to her, there was "not really" any conversation between them; she added, however, that he then began to kiss her. Joan stated that, about ten minutes after defendant's arrival, her sister came into the bedroom to get her cell phone charger. Joan testified that, when her sister entered the room, both she (Joan) and defendant were lying on the bed; Joan stated that, at that point in time, she "still had [her] clothes on," while defendant was in his boxer shorts. She further testified that her grandparents were asleep on the second floor while defendant was in the house.

In further testifying about the events of May 4, Joan stated that, after defendant began kissing her, they had "sexual intercourse." She stated that they were both naked and that defendant put "his penis in [her] vagina" and that "it hurt." Joan testified that defendant then "got dressed" and said, "I'll see you tomorrow." Joan stated that she then called her sister, who

---

5. During the trial, Joan referred to the adults with whom she and Jane lived as her "grandparents;" however, Jane referred to them as her "mom and dad." For the sake of simplicity, in view of the fact that the record does not provide a definitive answer as to this relationship issue (which has no bearing on the issue before us), we shall refer to the individuals in question as the "grandparents" of Joan and Jane.

had been waiting in the living room section of the basement watching television, and her sister then opened the door for defendant to leave. Joan testified that, immediately afterwards, she told her sister what had just transpired between defendant and her.

Joan testified that defendant and she continued to exchange text messages after the May 4 encounter; she added that, two days after that encounter, defendant told her that he "didn't want to get caught" and that he was worried about going to jail.

Joan went on to testify that, some two weeks later, defendant asked her "to bunk school"[6] so that they could meet again. She stated that defendant told her that, if she were to get caught, she should "just say that [she was] 19" and that she went to Providence College. Joan testified that she told defendant that she did not want to bunk school; she said that, instead, he picked her up after school on May 14 and "took [her] to his house."[7] Joan testified that, when they arrived, he took off her clothes as well as his own and they "had sex." Joan stated that the sexual intercourse hurt as it had the previous time; she added that defendant used a condom on both occasions. She further testified that she was at defendant's house for about two and a half hours on May 14, during which time they did not engage in any conversation.

Joan testified that, after their second sexual encounter, she and defendant continued to exchange text messages for one or two more weeks. She stated that defendant then broke off the relationship; she said that he did so because her sister "was sending him text messages telling him to leave her [Joan] alone * * *."

Joan next testified that, after defendant broke things off, she was upset and "felt weird" due to the fact that he was the first person with whom she had ever had sex. She testified that her behavior changed at that point in time; she stated that she "wasn't doing [her] work and [she] would just cry." She further testified that, two days after defendant broke things off, a friend of hers noticed that she was crying during class and notified the teacher, who sent Joan to a school guidance counselor.

Joan testified that she related to the guidance counselor "everything that had happened." The counselor then called the woman whom Joan referred to as her aunt.[8] Joan stated that her aunt then took her to Hasbro Children's Hospital and that, at that point, she met with police officers.

## B

### The Testimony of Jane

Jane testified that she first came to know defendant "[t]hrough a friend on Mi-Gente." She stated that she first commu-

---

**6.** The expression "to bunk school" is a regionalism for the activity that elsewhere is referred to by such expressions as "to ditch school" or "to skip school" or "to play hooky."

Interestingly, The Random House Dictionary of the English Language 278 (2d ed. 1987) states that the verb "bunk" is British Slang, and that dictionary indicates that the following is the first meaning of the word: "to absent oneself from." As a usage example, the dictionary gives: "to *bunk* a history class." *Id.*

**7.** On cross-examination, defendant testified that the house at which he and Joan spent time together on May 14 was actually his brother's house.

**8.** On the basis of other statements in the record, we infer that the person whom Joan refers to as her "aunt" is actually her great-aunt. However, in order to avoid overly complicating this narrative, we shall hereinafter simply refer to that person as Joan's "aunt."

nicated with defendant through e-mail on MiGente and that thereafter she began speaking with him by telephone once a week. Jane testified that they communicated in this manner for about two months before they first met in person.

Jane further testified that she told defendant that her name was "Sarah," adding that she did so because a woman named Sarah "wanted [Jane] to check up on him because she [i.e., Sarah] couldn't always be in Rhode Island and she was interested in him."[9] When asked by the prosecutor whether she herself was "interested in" defendant, Jane explicitly stated that she was not interested in him because she was a lesbian.

Jane further testified that the first time that she met defendant in person was in May of 2007, when he came to the house to see her sister. (See section I A, supra.) Jane stated that defendant arrived around 9:30 p.m. and that she opened the door for him. She testified that defendant went into her sister's bedroom; she added that about an hour later she went downstairs to that bedroom in order to get her cell phone charger. She said that Joan opened the door to the bedroom; Jane testified that her sister was fully clothed while defendant was lying on the bed and "had no shirt on and his pants were unzippered [sic]" Jane further testified that defendant stayed in Joan's bedroom until around 11:30 p.m. and that Joan then called her (Jane) to ask her to "help him out of the house." Jane further stated that she "went upstairs to talk to [her] [grandparents] while [defendant] left the house" so

that "no one would see him." She stated that her grandfather was awake during this time and was watching television.

Jane testified that she had previously overheard two telephone conversations between defendant and Joan (who was using a speakerphone). Jane stated that, during the first conversation, she heard Joan tell defendant that she was thirteen; Jane said that defendant responded to Joan that, if she were to get caught, she should "say that she was 19 and she went to [Providence College]." Jane testified that, during the second overheard telephone conversation, she heard defendant say "[t]hat his condom broke during intercourse," which statement Jane took to mean that the condom had broken during intercourse with her sister.

Jane testified that she had no further contact with defendant after overhearing the second telephone conversation. She also stated that Joan's friend, Mary Garcia, contacted defendant by using Jane's cell phone and told him to leave Joan alone "because he was hurting her."

### C

### The Testimony of the Remaining Prosecution Witnesses

Ellen Albanese, a guidance counselor at Joan's school, testified that Joan "had trouble fitting in" and "was in the office quite a bit with problems * * *." Ms. Albanese further testified that, one day in May of 2007, Joan came to her office and that, in the course of their conversation, Joan revealed to Ms. Albanese that she

---

9. Jane told the jury that "Sarah" about whom she testified was a twenty-five-year-old model who lived in Rhode Island and dated defendant. Jane testified that she first came to know Sarah on MiGente in 2003. She stated that she did not know Sarah's last name, but that she had met her in person "at the mall" once.

With respect to contacting defendant, Jane testified that Sarah sent her defendant's link and that she sent him a message from Sarah's webpage. Jane further stated that she used Sarah's password to communicate with defendant while pretending to be Sarah. Jane testified that it was Sarah, and not Jane, who told defendant that Jane was twenty-four.

had had sexual intercourse with a twenty-three-year-old man whom she had met over the internet. Ms. Albanese testified that Joan had also told her that that man had broken up with her on the previous night and that he had done so because Joan had told him that "she was suicidal and that she had cut herself."

Ms. Albanese proceeded to testify that she immediately called Joan's home and spoke with the girl's grandfather; she said that he sent his wife's sister to the school. Ms. Albanese stated that, once Joan's aunt [10] arrived at the school, she recounted to her exactly what Joan had discussed with her and recommended that the aunt take Joan to Hasbro Children's Hospital. Ms. Albanese further testified that the aunt "was agitated with [Joan]" when she arrived and asked Joan "[w]hat did you do this time?" Ms. Albanese stated that the aunt then asked Joan to pull up her sleeves; and, according to Ms. Albanese, "there were no cut marks."

Doctor Christine Barron, one of the two physicians who examined Joan at Hasbro Children's Hospital, was the next prosecution witness; she testified as an expert witness, qualified in pediatrics and child abuse and neglect. Doctor Barron testified that she performed a vaginal examination of Joan on June 19, 2007.[11] Doctor Barron stated that, in her opinion, "[Joan's] physical exam was significant for loss of hymenal tissue * * * consistent with her disclosure of sexual abuse that included penile/vaginal penetration on two separate instances." She stated that Joan reported to her that the two sexual incidents had occurred on May 4 and May 14.

Detective Douglas Allin, a detective in the Providence Police Department, testified as the final witness for the prosecution; he stated that in May of 2007 he was an investigator in the Special Victims Unit. He testified that his department had received a complaint involving Joan on May 21 and that on May 22 the case was assigned to him, at which point he made appointments with both Joan and Jane in order to obtain their statements. He stated that, by the time he took those statements, too much time had passed to retrieve the text messages exchanged with defendant.

## D

### The Testimony of Defendant

The defendant, Heriberto Rosario, took the stand in his own defense. He testified that he was born on March 16, 1984. He stated that he was a graduate of New England Institute of Technology and was working as a network engineer for Cox Communications at the time that the alleged instances of sexual intercourse took place. He testified that he was contacted by someone named Sarah on his MiGente webpage in approximately December of 2006. He stated that, after "about a month," he and Sarah exchanged phone numbers and began speaking on the phone and exchanging text messages; he added that they did so over a six-month period. He further testified that "Sarah" had told him that she was twenty-four or twenty-five years old, that "she had four children," and that "she [was a student] at Providence College."

---

10. See footnote 8, supra.

11. Although Joan originally went to Hasbro Children's Hospital on May 21, 2007, she was not given a thorough examination on that day. She did speak with hospital staff and the police on May 21; however, she thereafter left the hospital, having been given an appointment for a full examination "for a week later." (The record provides no explanation as to why the full examination did not take place at an earlier point in time.)

The defendant testified that, around April of 2007, Joan intercepted a text message that he had sent to "Sarah." He said that Joan responded to that text message by telling him that her sister was actually seventeen and that she (Joan) was "Sarah's" nineteen-year-old "older sister." The defendant proceeded to testify that, once he learned that "Sarah" was seventeen, he told Joan to tell "Sarah" that he "didn't want to talk to her anymore because * * * she's basically a younger person." He stated that Joan and he then started communicating and that Joan sent him a picture of herself. He testified that they communicated over the next few weeks and that they then decided to meet in person at Joan's house "just to hang out, basically."

The defendant testified that, when he arrived at Joan's house at approximately 9 or 9:30 p.m. on May 4, "Sarah * * * opened the door for [him]."[12] He stated that he then went down to the basement and went with Joan to her bedroom. He said that, once in Joan's bedroom, he sat on a chair and they then talked. He testified that, shortly after he arrived, Joan's sister came into the room in order to get her cell phone charger; he stated that he was clothed at that point in time. The defendant further testified that during his May 4 visit with Joan he never took his clothes off nor did he get onto Joan's bed. The defendant testified that he was in Joan's bedroom for about thirty to forty minutes. He stated that, after his visit

with Joan was over, he left through the back door unescorted.

The defendant testified that he and Joan continued to communicate after that May 4 encounter and that they made plans to meet again in order to "watch a movie [and] talk." The defendant stated that on that second occasion, which he later acknowledged to have occurred on May 14, he and Joan went to his brother's house, where they stayed for approximately an hour and watched a movie while "hugging" on the couch. The defendant further testified on cross-examination that, while at his brother's house, Joan told him that "she went to [Providence College] and she was * * * a business student."

In questioning defendant about his second encounter with Joan, defense counsel asked defendant whether he had "in any way assault[ed] [Joan] sexually" or had "any type of sexual contact with [Joan] whatsoever," including kissing her. The defendant's response was: "No."

The defendant testified that, about a week after his second meeting with Joan, he received a text message from "Sarah" telling him that Joan was sixteen years old. The defendant stated that he responded to that text message by sending a message saying that he "basically didn't want to talk to [Joan] anymore." The defendant then proceeded to testify that Joan herself had told him that she was actually thirteen and that "Sarah" had told him "the same thing;" he said that Joan had told him her "real age" after they "hung out the second time."[13]

12. With respect to when defendant first learned the real name of Joan's sister (whom we refer to pseudonymously as Jane), defendant initially testified on cross-examination that, by the day when he and Joan spent time together at his brother's house, he had learned that the sister's name was not "Sarah." However, later in his cross-examination he testified that he did not learn the

sister's actual name until he went to the Providence Police Department on May 23, 2007; he stated that, prior to that point in time, he believed that the sister's name was "Sarah."

13. On cross-examination, defendant stated that, after their second encounter, Joan told him that she was sixteen and that it was Joan's sister and not Joan herself who informed him that Joan was actually thirteen.

Defense counsel concluded his direct examination of defendant by asking him: "Now, at any time under any circumstances did you have any sexual relationship with [Joan]?" The defendant's unequivocal response was: "No, not at all."

## E

### Jury Deliberations and Verdict; Subsequent Travel

The jury began deliberations on October 20, 2008. Later that same day, the jury foreman requested that the court provide the jurors with the transcript of defendant's testimony concerning "when he found out [that] [Joan] was underage, post May 14th, and any additional comments on cross-examination."

On October 21, 2008, after conferring with the prosecutor and defense counsel, the trial justice had the requested testimony read back to the jurors. Later that same day, after receiving a note [14] from the jury foreman concerning the status of the deliberations, the trial justice gave an *Allen* charge [15] to the jury. In due course later on October 21, the jury returned a guilty verdict on both counts.

Thereafter, a motion for a new trial was filed, which motion was heard by the trial justice on October 30, 2008. At the hearing, defense counsel contended that the evidence, when considered in "the context of human nature and how human beings

ordinarily interact * * *, [did] not fit in with ordinary human conduct * * *." Counsel went on to argue that the testimony of Joan and Jane was at points "contradict[ory]" and largely "improbable" and even "completely untrue;" he added that Joan's testimony also contained "such a dramatic lack of any supportive details" that it "defie[d] all kinds of common sense * * *." In conclusion, defense counsel contended that, "by a fair preponderance of the evidence, [the jury] should have had a reasonable doubt;" he added that the verdict did "not do substantial justice."

After hearing the state's response to defense counsel's argument in support of the motion for a new trial, the trial justice denied the motion; in his remarks from the bench, the trial justice clearly and extensively articulated on the record his reasons for so ruling.

On January 23, 2009, the trial justice sentenced defendant to twenty-five years imprisonment on each of the two counts— said sentences to run concurrently, with ten years to serve on each count, fifteen years suspended and fifteen years probation. Thereafter, defendant timely appealed his conviction to this Court.

On appeal, defendant argues that the trial justice erred in denying his motion for a new trial because, according to defendant, "the evidence was simply too contra-

---

**14.** The October 21, 2008 note from the jury foreman that is referenced in the text indicated that the jury was having a difficult time making a decision. The following portion of that note reveals the concerns of the jurors at that point in their deliberations:

"We have discussed the details of this case to the Nth degree. We agree that many of those who testified were, at one point, lying.

"* * *. We've agreed on the surrounding facts. The minority cannot take the leap that the circumstances lead to the con-

clusion that there was sexual intercourse. The majority can."

**15.** An *"Allen* charge" is defined by a well-respected legal dictionary as follows: "A supplemental jury instruction given by the court to encourage a deadlocked jury, after prolonged deliberations, to reach a verdict. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)." Black's Law Dictionary 87 (9th ed. 2009); *see also State v. Gordon*, 30 A.3d 636, 640 n. 9 (R.I.2011); *State v. Vargas*, 21 A.3d 347, 351 n. 8 (R.I. 2011).

dictory and incredible to sufficiently support the verdict."

## II

### Standard of Review

■ The analytical process to be adhered to when a *nisi prius* court considers a motion for a new trial is well established in this jurisdiction. *State v. Cerda*, 957 A.2d 382, 385 (R.I.2008). In dealing with such a motion, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Guerra*, 12 A.3d 759, 765 (R.I.2011) (internal quotation marks omitted); *see also State v. Karngar*, 29 A.3d 1232, 1235 (R.I. 2011); *State v. Adefusika*, 989 A.2d 467, 480 (R.I.2010); *Cerda*, 957 A.2d at 385. That undertaking requires the trial justice to "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Morales*, 895 A.2d 114, 121 (R.I.2006); *see also State v. Kizekai*, 19 A.3d 583, 589–90 (R.I.2011); *State v. Guerrero*, 996 A.2d 86, 89 (R.I.2010).

■ If, after carrying out that three-step process, "the trial justice concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did, the verdict should be affirmed and the motion for a new trial denied." *State v. Texieira*, 944 A.2d 132, 140 (R.I.2008); *see also State v. Cipriano*, 21 A.3d 408, 429 (R.I.2011); *State v. Cardona*, 969 A.2d 667, 672 (R.I. 2009); *Cerda*, 957 A.2d at 385.

■ However, if "the trial justice is not in agreement with the jury's verdict, then it is incumbent upon him or her to embark on a fourth analytical step." *Guerra*, 12 A.3d at 765; *see also State v. DiCarlo*, 987 A.2d 867, 870 (R.I.2010); *State v. Rivera*, 839 A.2d 497, 503 (R.I.2003). That fourth step requires the trial justice to determine "whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted." *Guerra*, 12 A.3d at 765–66 (internal quotation marks omitted); *see also State v. Staffier*, 21 A.3d 287, 290–91 (R.I.2011); *DiCarlo*, 987 A.2d at 870; *Rivera*, 839 A.2d at 503.

■ On appeal, this Court accords "great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." *Texieira*, 944 A.2d at 140–41; *see also Morales*, 895 A.2d at 119, 122. Accordingly, the record "should reflect a few sentences of the justice's reasoning on each point." *Guerra*, 12 A.3d at 766 (internal quotation marks omitted); *see also State v. Luanglath*, 863 A.2d 631, 637 (R.I. 2005); *State v. Salvatore*, 763 A.2d 985, 991 (R.I.2001). The trial justice "need not refer to *all* the evidence supporting the decision;" rather, he or she "need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." *Guerra*, 12 A.3d at 766 (alteration in original) (internal quotation marks omitted); *see also DiCarlo*, 987 A.2d at 870; *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994).

■ A trial justice's ruling on a motion for a new trial will not be overturned on appeal "unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." *Texieira*, 944 A.2d at 141 (alteration in original) (internal quotation marks omitted); *see also State v. Pineda*, 13 A.3d 623, 641 (R.I.2011); *State*

*v. Scanlon,* 982 A.2d 1268, 1279 (R.I.2009); *State v. Bergevine,* 942 A.2d 974, 981 (R.I. 2008). "This Court employ[s] this deferential standard of review * * * because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Guerra,* 12 A.3d at 766 (alteration and omission in original) (internal quotation marks omitted); see *also State v. Ferreira,* 21 A.3d 355, 365 (R.I.2011); *Texieira,* 944 A.2d at 141.

## III

### Analysis

■ In ruling on defendant's motion for a new trial, the trial justice thoroughly reviewed and summarized the testimony of all of the trial witnesses while simultaneously noting that there were some inconsistencies when one compared the testimonies of the witnesses—*i.e.,* that various witnesses testified differently about some aspects of what had taken place. The trial justice prefaced his ruling by stating that it was his responsibility to determine "whether or not the nub of the testimony [was] believable." Moreover, in explaining his reasoning with respect to the motion for a new trial, the trial justice explicitly referred to this Court's decision in *Cerda, supra,* wherein we affirmed the denial of a motion for a new trial; that opinion had been issued a mere ten days before the hearing on defendant's motion for a new trial in the instant case. Examining *Cerda,* the trial justice noted that that case also required a determination as to the "believability of witnesses" who had made inconsistent statements. The trial justice, after summarizing this Court's reasoning

in *Cerda* with respect to inconsistencies in testimony, made the following statement as to how the reasoning in *Cerda* applies to the instant case:

> "[E]ven when [the court has] found that there are inconsistencies in certain statements made that don't seem credible, you don't throw out all [of] the testimony simply because of that."

The trial justice went on to expressly state that he was "satisfied that the nub of the testimony of [Joan] and [Jane] was believable and credible." [16] The trial justice recognized that the sole question to be answered with respect to defendant's guilt or innocence was whether or not sexual intercourse had occurred between a child under the age of fourteen (*viz.,* Joan) and defendant. The trial justice then proceeded to make credibility determinations with respect to the witnesses' testimony. He stated that he accepted Joan's testimony that there had been sexual intercourse; and he found that Dr. Barron's testimony, although "not conclusive," was consistent with the statements made by Joan. He further stated that he did not believe defendant's story that he had been meeting with Joan just to "get to know [her]."

The trial justice concluded by stating:

> "[E]ven if there were inconsistencies, the thrust or the nub of the testimony was clearly consistent, in my mind, clearly believable, and the defendant's testimony was not.
>
> "So, as a thirteenth juror, I would have concurred with the unanimous verdict. So, it appears to this Court that the evidence adduced at the trial is such that the controversy presented to the jury for its determination is one in which

16. The relevant definition of the ancient, but certainly not fusty, word "nub" (a word thrice used by the trial justice in characterizing certain witness testimony) is: "The essence; the core." It is a word that is ultimately derived from Middle Low German. The American Heritage Dictionary of the English Language 1205 (4th ed. 2006).

reasonable minds could differ as to the conclusion that it could reach.

"The Court is satisfied that the State has produced sufficient evidence that proves beyond a reasonable doubt that the defendant committed the crimes for which he has been convicted. The Court is further satisfied that the jury understood and followed its instructions in reaching its verdict. Accordingly, the defendant's motion for a new trial is denied."

It is clear from the just-quoted language from the trial justice's bench ruling on the motion for a new trial that, not only did he conclude that reasonable minds could differ as to what the verdict should be, but he also expressly stated that he "would have concurred with the unanimous verdict." *See State v. Imbruglia*, 913 A.2d 1022, 1028 (R.I.2007) ("If the trial justice concludes that he or she would have reached the same result as the jury did or that reasonable minds could differ as to the result, the motion for a new trial must be denied.").

After carefully reviewing the entire record, we conclude in this case, as we did in *Cerda*, 957 A.2d at 386, that the trial justice "did not overlook or misconceive any material and relevant evidence, nor was he clearly mistaken in choosing which testimony to accept and reject." *See also Adefusika*, 989 A.2d at 481; *Morales*, 895 A.2d at 122. Accordingly, we perceive no error in the trial justice's denial of the motion for a new trial.

## IV

### Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

Justice INDEGLIA did not participate.