**Supreme Court**

No. 2013-4-C.A.

(P2/11-2297AG)

| | |
|---|---|
| State | : |
| v. | : |
| Mohamed Nabe. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State             :

v.             :

Mohamed Nabe.        :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, Mohamed Nabe, appeals from a judgment of conviction on one count of carrying a firearm in a motor vehicle without a license. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After a close review of the record and careful consideration of the parties' arguments (both written and oral), we are satisfied that cause has not been shown and that this appeal may be decided at this time. For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction.

**I**

**Facts and Travel**

On May 2, 2011, a drive-by shooting occurred near the intersection of Camp Street and Doyle Avenue in Providence.  Subsequently, on August 5, 2011, the state filed a multi-count criminal information charging defendant and a codefendant, Jean Sajous, in connection with that

shooting.[1] On May 18, 2012, the state filed a second criminal information against defendant charging him with additional crimes relating to the May 2 shooting incident. Prior to trial, the state dismissed several of the counts against defendant that had been charged in the two criminal informations; and the trial justice consolidated for trial the remaining counts in the two cases stemming from the two separate informations. A trial was held in June of 2012 with respect to the following charges: carrying a handgun in a motor vehicle without a license in violation of G.L. 1956 § 11-47-8(a); operating a motor vehicle in an attempt to elude the police in violation of G.L. 1956 § 31-27-4; discharging a firearm from a motor vehicle with a substantial risk of death or serious bodily injury in violation of § 11-47-51.1; conspiracy to discharge a firearm from a motor vehicle in violation of G.L. 1956 § 11-1-6; using a firearm while committing a crime of violence in violation of § 11-47-3.2(b); driving with a suspended license in violation of G.L. 1956 § 31-11-18; and solicitation in violation of § 11-1-9. Prior to trial, the parties stipulated that, on May 2, 2011, defendant did not have a duly issued license or permit to carry or possess a pistol. We summarize below the salient aspects of what occurred at trial.

## A

### The Testimony of Officer David Lorince

Providence Police Officer David Lorince testified for the state. He stated that, on May 2, 2011, Officer Donald Castigliego and he had been driving in their patrol car on Camp Street

---

[1]    On February 6, 2012, Jean Sajous pled nolo contendere to the following offenses stemming from the drive-by shooting: carrying a handgun in a motor vehicle without a license in violation of G.L. 1956 § 11-47-8(a); assault in violation of G.L. 1956 § 11-5-2; conspiracy to discharge a firearm from a motor vehicle in violation of G.L. 1956 § 11-1-6; discharging a firearm from a motor vehicle with a substantial risk of death or serious bodily injury in violation of § 11-47-51.1. On each of those counts, he was sentenced to six years imprisonment, which sentences were to run concurrently. Mr. Sajous also pled nolo contendere to one count of using a firearm while committing a crime of violence in violation of § 11-47-3.2(b); with respect to that count, Mr. Sajous received a ten-year suspended sentence, with probation. A judgment to that effect was entered on February 22, 2012.

- 2 -

headed towards Doyle Avenue when he observed a dark-colored Nissan Maxima turn onto Doyle Avenue. Officer Lorince testified that, approximately ten to fifteen seconds later, he "observed a single gunshot out of the passenger side of [the] Maxima." According to Officer Lorince, the occupants of the Maxima then fled the scene; he added that Officer Castigliego activated the patrol car's lights and sirens and that the two officers "gave chase to the vehicle."

Officer Lorince testified that the Maxima drove through the intersection of Doyle Avenue and North Main Street and continued onto Randall Street, at which point it "skidded and hit [a] utility pole." He stated that, as their patrol car was pulling up alongside the passenger's side of the Maxima, two individuals exited the vehicle. At trial, Officer Lorince identified defendant as the individual who exited from the driver's side, and he stated that he later learned that the individual who exited from the passenger's side was Mr. Sajous. It was Officer Lorince's testimony that, as Mr. Sajous exited the Maxima, he "was holding his waist like he was holding something or his pants were going to fall off when he ran."[2] Officer Lorince testified that he then pursued both individuals on foot and that, assisted by additional officers who had responded to the scene, he apprehended them in the parking lot of a nearby Marriott Hotel. Officer Lorince further testified that, after the two individuals were arrested, the police found a firearm in a trash can which Officer Lorince had seen Mr. Sajous run past during the chase; he acknowledged, however, that he had not seen defendant pass that same trash can while he was being chased.

---

[2] The testimony of Providence Police Officer Donald Castigliego with respect to what occurred on the evening of May 2, 2011 was largely consistent with that of Officer Lorince. Notably, Officer Castigliego testified that, as Mr. Sajous was exiting the vehicle, "he was clutching his waist as if he was concealing something;" Officer Castigliego added that, based on his training and experience, he believed that the "something" could be a "firearm or a weapon."

# B

## The Testimony of Det. Paul Renzi

Detective Paul Renzi of the Providence Police Department's Bureau of Criminal Identification testified that, on May 2, 2011, he responded to a crime scene at the Marriott Hotel in Providence. He stated that, when he arrived at the hotel, his "attention was directed to the rear of the Marriott to a trash can which was being watched over by a patrolman * * * ." He testified that in that trash can he observed a pistol which had been placed inside of a black sock, with the barrel sticking out of the sock. Detective Renzi further testified that he fingerprinted the firearm, the magazine, and a spent cartridge casing; he acknowledged, however, that, "[b]ecause of [the] sock," he was not able to recover any fingerprints. The exhibits at trial indicated that the serial number of the gun recovered from the trash can matched that of a gun purchased by one Ronique Perou (to whose testimony we turn next).

# C

## The Testimony of Ronique Perou

Ronique Perou testified that, having previously obtained a gun permit, she purchased her first gun on April 12, 2011 at a store in Woonsocket called "Bullseye."

Ms. Perou testified that she had met defendant and Mr. Sajous (whom she referred to as "Beans") approximately three years prior to trial. With respect to her relationship with the two men, she further testified that she had seen defendant visiting the home of a friend of his which was close to where she lived in Providence and that she and defendant had exchanged greetings on several occasions. Ms. Perou stated that, in late April of 2011, defendant came to her home, where he observed an empty box of bullets; she added that, when defendant asked her if she had

a gun, she told him that she did. She testified that shortly thereafter, on May 2, 2011,[3] defendant again visited her home, where she showed him her gun upon his request; she added, however, that, when he asked her if he could borrow her gun, she refused. It was Ms. Perou's further testimony that defendant then asked her if she could "get [him] one" because, as he informed her, he would not be able to obtain a gun permit due to a previous arrest. She stated that she assented to defendant's suggestion that she use her permit to purchase a gun and have it "transfer[red] to his name."

Ms. Perou testified that, later that same day (May 2), she drove defendant to the Woonsocket gun store called Bullseye. She further testified that they went into the store together and that defendant gave her one hundred dollars. It was her testimony that she filled out the paperwork relative to the gun purchase, listing herself as the actual buyer of the firearm. She stated that she used the money given to her by defendant to place a deposit on the gun, which could be picked up after a seven-day waiting period.[4]

According to Ms. Perou, she and defendant then returned to her home, where defendant asked her if he could see her gun again.[5] Ms. Perou testified that, when she showed defendant

---

[3]     The reader will recall that the shooting that is at the center of this case occurred on May 2, 2011.

[4]     Ronique Perou testified that, with respect to the trip to the gun store to purchase a second firearm, she was charged by the state with one count of providing false information in securing a firearm in violation of § 11-47-23; it was her testimony that she pled guilty to that charge after entering into a cooperation agreement with the state. Pursuant to the cooperation agreement, Ms. Perou agreed to testify truthfully with respect to the events of May 2, 2011 in exchange for the state's recommendation that she receive a suspended five-year sentence, with probation. In addition, Ms. Perou acknowledged that, "as part of [her] agreement with the State, [she was] promised that [she] would not be prosecuted by the Federal Government[.]"

[5]     The reader will recall that Ms. Perou had previously purchased a gun on April 12, 2011— which gun is not to be confused with the gun on which she made a deposit on May 2, 2011. The gun purchased in April of 2011 is the one that is at issue in this case.

her gun, he asked her if he could take it to show to a friend of his. She stated that she told defendant no, but that he then grabbed the gun from her hand and departed. Ms. Perou testified that she followed defendant outside, where he told her that he was not going to do anything with the gun other than show it to a friend; she added that he drove away from her home in a "[b]lack Maxima" that was waiting outside. Ms. Perou testified that she then tried calling defendant by phone but that she was not able to reach him until later that day, at which point he assured her that nothing would happen with her gun. According to Ms. Perou, the next day she attempted unsuccessfully to locate defendant's friend "Beans" so that he could help her locate defendant.

Ms. Perou stated that, on May 4, 2011, she filed a report with the Providence Police Department alleging that the gun had been stolen; she added that, because she did not want to get "in trouble," she told the police that someone had broken into her home and had stolen the gun. On cross-examination, Ms. Perou acknowledged that, when agents from the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) first questioned her on June 23, 2011, she gave a recorded statement repeating in substance her statement to the Providence Police Department. (That was the first of four recorded statements that Ms. Perou made to ATF that day.) Ms. Perou further testified at trial that, after becoming somewhat "scared" when the ATF agents told her that they thought she was lying to them and that, if she was lying, they would charge her with a crime, she gave a second recorded statement; in that statement she told the ATF agents that her gun could have been stolen by defendant, by "Beans," or by a third man who wore "braids"—in view of the fact that all three of them had been at her home for a party in April. She stated that the ATF agents again told her that they thought she was lying and that, if she was not telling the truth, she would be charged with a crime; and she acknowledged that the ATF agents also told her that they believed defendant had taken the gun and that she was trying

to protect him. Ms. Perou testified that, after listening to those statements by the ATF agents, she gave a third recorded statement, in which she admitted that defendant had taken the gun from her. She further testified that she also told the ATF agents about having gone with defendant to purchase a gun for him.[6] Ms. Perou also stated that several months later, on February 9, 2012, she was again interviewed by the ATF agents, at which time she told them that defendant had not taken her gun until approximately two to three days after she had gone to the gun store with him—which contrasted with her trial testimony that defendant had taken her gun that same day, May 2, 2011. At trial, Ms. Perou explained that she made the February 9, 2012 statement only because the ATF agents told her that defendant could not have taken her gun on May 2.

## D

### The Testimony of Paul Connolly

Paul Connolly, the owner of Bullseye Shooting Supply in Woonsocket, testified that he was familiar with Ms. Perou because she had purchased firearms from his store, whereas he stated that he did not recognize defendant. At trial, he identified a form that Ms. Perou had filled out on May 2, 2011 in connection with her purchase of a firearm (which would have been her second firearm); and he further testified that she came into the store by herself on that date. It was Mr. Connolly's testimony that he had previously refused to sell firearms to customers whom he suspected of attempting to make a "straw purchase," and he stated that he would not have sold the firearm to Ms. Perou if, when she was filling out the just-referenced form, "there was another gentleman standing with her that then gave her $100 to pay for that firearm * * * ."

---

[6] Although Ms. Perou testified that she gave a fourth recorded statement to the ATF agents on June 23, 2011, she did not testify with specificity as to the contents thereof.

- 7 -

Mr. Connolly acknowledged that, in October of 2011, ATF agents came to his store and asked him questions about purchases made there; he stated that he "cooperated with them." He also stated that he "do[es] everything [he] can to assist law enforcement * * * ."

**E**

**The Verdict, the Motion for a New Trial, and the Sentencing**

After the parties had rested, the trial justice instructed the jury. On June 12, 2012, the jury convicted defendant of carrying a firearm in a motor vehicle without a license and attempting to elude a police officer, while it acquitted him of the remaining charges.[7]

The defendant then moved for a new trial with respect to both convictions pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The trial justice granted the motion for a new trial on the charge of attempting to elude a police officer, but he denied defendant's motion with respect to the charge of carrying a firearm in a motor vehicle without a license.[8] In due course, the trial justice sentenced defendant to seven years imprisonment, with eighteen months to serve and the remainder suspended, with probation. A timely appeal was filed.

On appeal, defendant contends that the trial justice should have granted his motion for a new trial as to the charge of carrying a firearm in a motor vehicle without a license because, in his view, there was no evidence that he was aware that his codefendant was in possession of a gun until the gun was fired on Doyle Avenue.

---

[7] After both parties had rested, the trial justice dismissed the charge of driving with a suspended license, leaving six counts to go to the jury (see infra).

[8] In ruling on defendant's motion for a new trial, the trial justice ruled that, based on the evidence presented at trial, a fair inference could be drawn that defendant had sole possession of the firearm at issue in this case when he entered the vehicle on May 2, 2011. It follows from that ruling that the trial justice concluded that the jury had an adequate evidentiary basis on which to convict defendant of possession of a firearm in the motor vehicle—despite the fact that Mr. Sajous had pled nolo contendere to discharging a firearm from a motor vehicle on the day in question.

## II

## Standard of Review

When a trial justice considers a motion for a new trial, he or she "acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Silva, 84 A.3d 411, 416 (R.I. 2014) (internal quotation marks omitted); see also State v. Mitchell, 80 A.3d 19, 30 (R.I. 2013); State v. Rosario, 35 A.3d 938, 947 (R.I. 2012). In fulfilling his or her role as the thirteenth juror, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." State v. Espinal, 943 A.2d 1052, 1058 (R.I. 2008) (internal quotation marks omitted); see also State v. Baker, 79 A.3d 1267, 1273 (R.I. 2013); State v. Paola, 59 A.3d 99, 104 (R.I. 2013). If, after conducting this three-step analytical process, "the trial justice agrees with the jury's verdict or determines that reasonable minds could differ, then the analysis is complete and the verdict should be affirmed." State v. Harrison, 66 A.3d 432, 445 (R.I. 2013) (internal quotation marks omitted); see also State v. Kizekai, 19 A.3d 583, 590 (R.I. 2011).

We have stated that the "record should reflect a few sentences of the justice's reasoning on each point * * * ." Silva, 84 A.3d at 417 (internal quotation marks omitted). However, we have also indicated that "the trial justice need not refer to all the evidence supporting the decision * * * ." Id. (internal quotation marks omitted). In ruling on a new trial motion, "[t]he trial justice need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." Id. (internal quotation marks omitted).

When we review the trial justice's denial of a motion for a new trial, "we do not focus on whether this Court simply agrees or disagrees with [his or her] credibility determinations," but rather we are "deferential to those determinations." State v. Clay, 79 A.3d 832, 842 (R.I. 2013) (internal quotations marks omitted); see also State v. LaPierre, 57 A.3d 305, 311 (R.I. 2012). Accordingly, "[i]f the trial justice has complied with [the requisite] procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." Paola, 59 A.3d at 104 (internal quotation marks omitted); see also Clay, 79 A.3d at 842.

### III

### Analysis

It is our judgment that the trial justice conducted the appropriate three-step analysis before denying defendant's motion for a new trial with respect to the charge of carrying a firearm in a motor vehicle without a license. The record indicates that the trial justice first properly considered the evidence in light of the jury charge. Moving next to the second step, the trial justice proceeded to independently assess the credibility of the witnesses and the weight of the evidence. With respect to the credibility of Ms. Perou, the trial justice stated as follows:

> "I recognize that Miss Perou [gave] inconsistent statements, but I'm satisfied that as she went through the testimony, she did explain why they were inconsistent, and when she got to the bottom line, it was clear to me, as a front-row observer, of watching her and listening to her, that her inconsistent statements were really borne [sic] of a concern for her own situation with immigration or with the ATF. She didn't want to get herself in trouble. She obviously didn't want to get [defendant] in trouble either, at least not at first."

In contrast, the trial justice found Mr. Connolly to be an "overearnest witness looking too hard to please law enforcement, particularly the ATF." The trial justice further found that Ms. Perou's testimony "reflected * * * defendant's clear desire to get his hands on a handgun," and he stated that he had "no difficulty in accepting her rendition that it was [defendant] who had [her] gun and introduced that gun into the vehicle that night." Based on the evidence presented at trial, it was the opinion of the trial justice that a fair inference could be drawn that, when defendant entered the vehicle, he had sole possession of the firearm at issue in this case; and, although he noted that, "at one point, [Mr.] Sajous picked it up and used it," he found that "the gun was shared by both of them that night." The trial justice then concluded, pursuant to the third step in the analytical process, that he would have reached the same result as the jury, stating:

> "I'm well satisfied that * * * defendant was properly convicted beyond a reasonable doubt of unlawfully carrying a firearm in a motor vehicle without a duly-issued license or permit * * * ."

Accordingly, the trial justice denied defendant's motion for a new trial with respect to that charge. See State v. Guerra, 12 A.3d 759, 765 (R.I. 2011) (stating that if, after conducting the required three-step analysis, the trial justice agrees with the jury's verdict, "then the inquiry is at an end and the motion for a new trial should be denied").

The defendant contends that, without the testimony of Ms. Perou, whose testimony he asserts was lacking in credibility, "[t]here was absolutely no evidence of any statements or conversations which indicated [that the defendant had actual possession of the gun or] that [he] was aware that [Mr.] Sajous possessed a gun prior to [Mr.] Sajous' discharge of the weapon." After a careful review of the record in this case, it is clear to us that the defendant's contention on appeal amounts to nothing more than a disagreement with the trial justice's assessment of the credibility of the witnesses and the weight of the evidence. See State v. Gonzalez, 56 A.3d 96,

103 (R.I. 2012) (stating that "[t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial") (internal quotation marks omitted); see also Clay, 79 A.3d at 842; State v. Ferreira, 21 A.3d 355, 367 (R.I. 2011). The trial justice recognized that Ms. Perou had given inconsistent statements to the police and the ATF; however, he was satisfied by her explanation as to why she had done so, and he ultimately chose to accept her in-court testimony with respect to the events of May 2, 2011. We have stated on more than one occasion that "the presence of some inconsistencies between or among utterances of a witness or witnesses at different points in time does not ipso facto render the testimony unworthy of belief." State v. Jensen, 40 A.3d 771, 781 (R.I. 2012); see also Rosario, 35 A.3d at 948-49. We are unable to conclude that the trial justice overlooked or misconceived material evidence or was clearly wrong in crediting Ms. Perou's testimony that the defendant had taken her handgun. See Paola, 59 A.3d at 106 ("[T]his Court affords a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record.") (internal quotation marks omitted); see also State v. DiCarlo, 987 A.2d 867, 872 (R.I. 2010). We therefore perceive no error in the trial justice's denial of the defendant's motion for a new trial with respect to the charge of carrying a firearm in a motor vehicle without a license.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record in this case may be returned to that tribunal.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    State v. Mohamed Nabe.

**CASE NO:**    No. 2013-4-C.A.
(P2/11-2297AG)

**COURT:**    Supreme Court

**DATE OPINION FILED:**  June 16, 2014

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

    For State:  Christopher R. Bush
              Department of Attorney General

    For Defendant:  Janice M. Weisfeld
              Office of the Public Defender