**Supreme Court**

No. 2011-118-M.P.

(K1/06-628A)

State                          :

v.                             :

James Paola.                   :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| James Paola. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.** This case came before the Supreme Court on writ of certiorari on November 29, 2012, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. James Paola (defendant or Paola) appeals from a judgment of conviction after a jury verdict finding him guilty of several acts of child molestation and sexual assault.[1] Specifically, on September 19, 2008, Paola was found guilty of one count of first-degree child molestation sexual assault and one count of third-degree sexual assault arising from a series of assaults upon his stepdaughter, whom we shall refer to as Sarah, and one count of second-degree child molestation sexual assault arising from a single incident concerning another stepdaughter, whom we shall refer to as Samantha.[2]

On November 24, 2008, the trial justice heard and denied defendant's motion for a new trial. Thereafter, defendant was sentenced to concurrent sentences of thirty years, eighteen years

---

[1] The defendant filed an untimely notice of appeal on March 24, 2009. Thereafter, appointed counsel from the Public Defender's Office filed a petition for the issuance of a writ of certiorari to review the judgments of conviction. This Court granted the petition.

[2] We refer to the victims and their family members by pseudonyms to protect their privacy.

to serve, the balance suspended, with probation, for first-degree child molestation; five years to serve for third-degree sexual assault; and thirty years, five years to serve, the balance suspended, with probation, for second-degree child molestation. Before this Court, defendant argues that the trial justice erred by denying his motion for a new trial. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we proceed to decide the appeal at this time. We affirm the judgment of conviction.

**Facts and Travel**

In 1996, a romantic relationship developed between Paola and the mother of Sarah and Samantha; we shall refer to the mother as Mary. In addition to Sarah and Samantha, Mary had a third daughter, Emma, from a previous marriage, and Paola and Mary welcomed another daughter, Elizabeth, who was born in 1997. The two married in 1998, and the family took up residence in Warwick, Rhode Island.[3] In February of 2000, Sarah was eight years old, Emma was seven, and Samantha was five.[4]

Paola, who worked as a college recruiter, was described as an active father and stepfather. According to Sarah, Paola assumed the role of a father to her and her sisters; they would travel with him—together or individually—on his recruiting trips. Unfortunately, when Sarah turned eleven or twelve, their father-daughter relationship changed significantly because Paola developed a sexual interest in her.

Sarah testified that the first assault occurred in the downstairs family room, when, after watching a movie, the rest of the family went upstairs. Sarah and Paola stayed behind to watch

---

[3] In that house, Sarah shared a bedroom with her youngest sister, Elizabeth, while Samantha and Emma shared a separate bedroom.

[4] Sarah was born on October 22, 1991; Emma was born on January 12, 1993; and Samantha was born on August 26, 1994.

another movie, when Paola began rubbing her feet and legs, which was not an uncommon occurrence. On this occasion, however, Paola worked his hands all the way up her legs and placed his fingers into her vagina. Sarah, who testified that she was confused about this occurrence, did not disclose the touching to anyone. She testified that she "didn't mind it" and "it felt good."

After that night, Paola's affection for Sarah manifested itself in several ways; he bought her jewelry, including a charm bracelet, but instructed her to say that it was a gift from a friend. He also arranged to chaperone several of Sarah's school trips, including a trip to Washington, D.C. According to Sarah, Paola became angry with her when she did not spend enough time with him during the trip. Notwithstanding that quarrel, Paola bought Sarah a sweatshirt, a box of chocolates, and a silver "dog-tag" necklace.[5]

Paola also told Sarah that "he loved how close [they] were" and "we belong[] together." He penned notes to Sarah, which he would put in her lunch bag or on her pillow.[6] One such note—written in the wake of Paola's anger at Sarah for breaking the no-dating rule that he and Mary had instituted for the children—reminded Sarah that she was a "hot precious commodity" and cautioned her to "be careful how [she] flirt[s] with people" because "[i]t can cause problems." These missives often described how "special" their relationship was. Likewise, he wrote that they were "meant to be friends, close friends at that, for years to come! Forever." (Emphasis in original.)

The second sexual assault of which defendant was convicted also occurred in the family

---

[5] Sarah testified that the necklace made her feel as though she belonged to him.

[6] These notes were markedly different from the innocuous notes he would place in the lunch bags of his other stepdaughters; Paola spent more time writing long notes to Sarah, and those notes often were romantic, possessive, or sexually suggestive.

room. At the time, Sarah was wearing boxer shorts without any underwear. When the two were alone, they began "fooling around;" while Sarah was lying down on the couch, defendant began kissing her vagina for five to ten minutes.

However, Mary interrupted this episode when she came downstairs. According to Mary, Paola looked startled, "like a [deer] in the headlight," and Sarah's vagina was visible through her boxer shorts. Mary immediately began questioning them, but both insisted they had only been fooling around. Despite repeated inquiries by her mother, Sarah continued to deny that anything inappropriate had occurred. Sarah testified that she opted not to say anything because, again, "it felt good and [she] loved him."

An incident that emerged as significant at trial was the trip that Sarah and Paola took to Atlantic City, New Jersey when Sarah was thirteen. Sarah testified that Paola had let her drive his vehicle under his supervision on at least fifty occasions. On this occasion, Sarah testified, she drove the entire trip to New Jersey and most of the return trip. According to Sarah, she and Paola stayed in a single hotel room and got dressed up for a fancy dinner. At one point, as Sarah exited the shower, she found three sets of what the trial justice characterized as "rather daring" underwear stacked in the bathroom. When her mother discovered the lingerie, Sarah felt compelled to lie about its origin.

Certain events that transpired over the February 2006 school vacation also were explored at trial. Although it was not one of the charges of which defendant was convicted, Sarah testified that on yet another occasion in the downstairs family room, Paola began kissing her and touching her breasts. This time, Paola said, "I think [that] you're ready for me" before pulling down Sarah's sweatpants and inserting his penis into her vagina. Sarah testified that similar encounters occurred in other areas of the house during that vacation week. Emma, Sarah's younger sister,

testified that she observed Sarah and Paola lying side by side underneath a blanket.

Shortly after that school vacation, a chimney fire forced Mary to move her daughters out of the house; and, in March 2006, after experiencing marital difficulties for some time, Mary filed for divorce. No longer sharing a home, contact between Paola and Sarah became infrequent such that Paola appeared at Sarah's school one day. He asked school officials to have Sarah meet him at the main entrance to the school, at which point he gave Sarah her favorite lunch and asked about her current circumstances. He also inquired into whether she had "talked to anyone" about the sexual contact and cautioned her to refrain from saying "something to upset people." The defendant advised Sarah to refrain from disclosing what they had done because, according to Paola, "what [they] did wasn't just sex, [they were] making love and [they] were in love." Sarah returned inside the school building; and, although she contacted her mother about the visit, she did not disclose the abuse. A school friend observed that, after returning to class, Sarah appeared scared and upset.

Sarah finally confessed the sexual abuse to a friend, who advised her to report what had happened. Sarah did so to a trusted family member, whom we shall refer to as Amanda.[7] With Amanda's support and encouragement, Sarah told her mother and the three—Sarah, Amanda, and Mary—went to the Warwick police station to file a complaint.

As these events unfolded, it was discovered that Paola also had abused Samantha.[8] According to Samantha, she and Paola would play videogames in the downstairs family room,

---

[7] The record discloses that Amanda is Paola's niece; she always had been close with Sarah and her sisters.

[8] Samantha testified that she also traveled with Paola, sometimes with one of her sisters and sometimes alone. She acknowledged that Paola clearly favored Sarah, that they were "always together" and acted like they were married. Samantha stated that she also received notes in her lunch bag, but, unlike her sister, she never received jewelry or other gifts.

and on one occasion she and Paola began fighting over one of the videogame controllers. During that scuffle, Paola put his hand down Samantha's pants, under her underwear. In response, Samantha "jumped up" from the loveseat, hit Paola on the arm, and left the room. Samantha did not disclose this incident until after she learned that Paola had molested Sarah. In fact, Samantha previously had denied any improprieties to social service agencies. She testified that she lied because she liked Paola and did not want him to divorce Mary.

On October 24, 2006, a grand jury returned an indictment, charging Paola with one count of first-degree child molestation and four counts of first-degree sexual assault against Sarah, and two counts of second-degree child molestation against Samantha, in violation of G.L. 1956 §§ 11-37-2, 11-37-3, and 11-37-8.1 through 11-37-8.4.[9] In September 2008, a jury trial was held over several days in Providence County Superior Court. The state presented nine witnesses: Sarah, Samantha, Amanda, Mary, Emma, Det. Robert Page, two of Sarah's personal friends, and one of Mary's close friends. The defendant testified and denied engaging in any sexual contact, or inappropriate touching, with either of the complaining witnesses.

On September 19, 2008, the jury returned a verdict of guilty on one count of first-degree child molestation against Sarah, one count of third-degree sexual assault against Sarah, and one count of second-degree child molestation against Samantha. Thereafter, defendant filed a motion for a new trial in accordance with Rule 33 of the Superior Court Rules of Criminal Procedure. The trial justice denied the motion and sentenced defendant to concurrent terms of incarceration.

---

[9] Before the first trial of this case, the Superior Court dismissed two of the first-degree-sexual-assault charges. The ensuing jury trial on the remaining charges ended in mistrial on October 1, 2007.

Before this Court, defendant argues that the trial justice erred in denying his motion for a new trial.

## Standard of Review

"When a trial justice considers whether the verdict is against the weight of the evidence, he or she sits as the legendary thirteenth juror; and, in light of the charge to the jury, must exercise his or her independent judgment in weighing the evidence and assessing the credibility of the witnesses." State v. Smith, 39 A.3d 669, 673 (R.I. 2012) (quoting State v. Clark, 974 A.2d 558, 569 (R.I. 2009)). Specifically, "[t]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." State v. Vargas, 21 A.3d 347, 354 (R.I. 2011) (quoting State v. Prout, 996 A.2d 641, 645 (R.I. 2010)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." State v. Heredia, 10 A.3d 443, 446 (R.I. 2010) (citing State v. Snow, 670 A.2d 239, 244 (R.I. 1996)). "If the trial justice has complied with this procedure and articulated adequate reasons for denying the motion, his or her decision will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." Smith, 39 A.3d at 673 (quoting State v. Horton, 871 A.2d 959, 967 (R.I. 2005)); see also State v. Gomez, 848 A.2d 221, 234 (R.I. 2004). We employ this deferential standard of review because "a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." State v. Texieira, 944 A.2d 132, 141 (R.I. 2008).

**Discussion**

On appeal to this Court, defendant contends that the trial justice erred in denying his motion for a new trial. He argues that the evidence in this case, if properly analyzed, gives rise to serious doubts about the truth of the allegations and that the trial justice overlooked and misconceived material evidence. Paola also contends that the testimony of the complaining witnesses and their mother was neither credible nor reliable, and that the jury's verdicts failed to do substantial justice.

In contesting the trial justice's assessment of the testimony and evidence, defendant essentially challenges the trial justice's credibility determinations. This Court has stated that "[t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." State v. Rivera, 987 A.2d 887, 903 (R.I. 2010). "[T]he trial justice * * * has [had] the opportunity to observe the witnesses as they testify and therefore is in a better position [than this Court] to weigh the evidence and to pass upon the credibility of the witnesses * * *." Id. (quoting State v. Luanglath, 749 A.2d 1, 5-6 (R.I. 2000)). Therefore, unless the trial justice clearly erred in his credibility determinations or "overlooked or misconceived relevant and material evidence," we will not disturb the justice's determination on appeal. State v. Banach, 648 A.2d 1363, 1368 (R.I. 1994) (quoting Fontaine v. State, 602 A.2d 521, 525 (R.I. 1992)).

We are satisfied that the trial justice independently evaluated the evidence and assessed the credibility of the witnesses and did not overlook relevant and material evidence. The trial justice articulated the correct standard of review and referred to his independent evaluation of the credibility of each witness who testified. In so doing, he concluded that he was "very confident" that the jury reached the appropriate verdict. Specifically, the trial justice indicated that,

- 8 -

"[s]imply put, the state's case was compelling as to the counts of the conviction" and that he therefore "would have reached the same verdict as did the jury."

Indeed, our careful review of the record discloses that the trial justice thoroughly reviewed and summarized the testimony of all of the trial witnesses and issued a comprehensive decision setting forth his reasons for denying the motion for a new trial. He found that the testimony of Sarah and Samantha not only was "very credible," but also that it was corroborated by several other witnesses. The trial justice acknowledged that there were some inconsistencies in Sarah's testimony, but he stated that those inconsistences did not affect his conclusion that she was believable.[10] Additionally, the trial justice was mindful that Samantha had lied to the social service agency about any inappropriate conduct by defendant, but he concluded that her motivation for lying—she did not want defendant and her mother to divorce—was understandable.

In contrast, the trial justice characterized defendant's testimony as "self-serving, and lacking in credibility." The trial justice found that defendant's irrational explanation of such "innocuous issues" as his apparent inability to replace his bedroom door was "telling."[11] The

---

[10] A serious credibility issue came to light with respect to Sarah's testimony that she drove from Rhode Island to Atlantic City when she was thirteen years old, but the trial justice determined that there was substantial evidence that Sarah had driven under defendant's supervision in the past.

[11] Specifically, the trial justice explained that defendant's position that he "was just too inept to place a new [door] on the hinges"—after "the door to the marital bedroom was removed around 2004 and not put back on for over a year"—was "telling." The trial justice expounded that,

> "[a]lthough the defendant repeatedly told [Mary] that he couldn't put a repaired door back on because he didn't know how to do it, the defendant was then engaged in a substantial construction project in the basement level. This made his excuse completely absurd. It was clear to [Mary] (and equally clear to [the trial justice]) that the defendant wished the door to remain off its hinges. This provided him a ready-made excuse to avoid having intimate relations with his wife while spending more and more time with his girlfriend, [Sarah]."

trial justice declared that, although defendant was "smooth, calm and well-organized," his testimony "simply lacked credibility." After considering the entire record, the trial justice determined that credible evidence existed to support the jury's finding of guilt. Having concluded that he agreed with the verdict, the trial justice's new-trial analysis ended. See State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011) ("If the trial justice agrees with the jury's verdict or determines that reasonable minds could disagree about the outcome, then he or she must deny the new-trial motion * * *.").

As we have stated on multiple occasions,

> "[t]his Court affords 'a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record.'" State v. DiCarlo, 987 A.2d 867, 872 (R.I. 2010) (quoting In the Matter of the Dissolution of Anderson, Zangari & Bossian, 888 A.2d 973, 975 (R.I. 2006)).

Indeed, we "defer to trial justices who experience firsthand the delivery and demeanor of a witness's testimony." State v. Ferreira, 21 A.3d 355, 366 (R.I. 2011) (quoting State v. Guerrero, 996 A.2d 86, 90 (R.I. 2010)); see also State v. Collazo, 967 A.2d 1106, 1110 (R.I. 2009). "Therefore, looking at [the trial justice's] credibility determinations 'through a prism of deference, as we must,' we hold that the trial justice did not err in accepting [this] testimony as credible." Ferreira, 21 A.3d at 367 (quoting State v. Medeiros, 996 A.2d 115, 122 (R.I. 2010)); see also Guerrero, 996 A.2d at 90 ("[W]e consistently have engaged in a deferential review of a trial justice's credibility determinations.").

---

Likewise, the trial justice placed importance on defendant's denial that "any marital problems were caused by the missing door[,]" especially in light of Mary's testimony that "[o]ne of the issues discussed at their marriage counseling was the fact that the bedroom doorway remained open, resulting in a lack of intimacy between the married couple."

After carefully reviewing the record before us, it is our opinion that the trial justice did not overlook or misconceive any material and relevant evidence, nor was he clearly wrong in accepting and rejecting the testimony of the various witnesses.  The trial justice undertook a careful analysis of the evidence, the credibility of the witnesses, and the weight to be accorded their testimony.  Accordingly, we perceive no error in the trial justice's denial of the motion for a new trial.

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of conviction.  The papers in this case shall be remanded to the Superior Court with our decision endorsed thereon.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        State v. James Paola.

**CASE NO:**        No. 2011-118-M.P.
                    (K1/06-628A)

**COURT:**        Supreme Court

**DATE OPINION FILED:**  January 25, 2013

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**WRITTEN BY:**        Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Kent County Superior Court

**JUDGE FROM LOWER COURT**:

                    Associate Justice Edwin J. Gale

**ATTORNEYS ON APPEAL:**

                    For State:  Christopher R. Bush
                             Department of Attorney General

                    For Defendant:  Janice M. Weisfeld
                             Office of the Public Defender