**Supreme Court**

No. 2014-297-C.A.

(P2/14-732AG)

State                     :

    v.                  :

Luis Roldan.           :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

   v.                              :

Luis Roldan.                       :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  The defendant, Luis Roldan, was convicted of felony assault with a dangerous weapon, discharging a firearm while committing a crime of violence, and carrying a handgun without a license.  On appeal, he contends that the trial justice erred in denying his motion for a new trial.  For the following reasons, we affirm the judgment of conviction.

## Facts and Travel

The genesis for the crimes of which defendant stands convicted was a love-triangle feud that involved face-to-face and Facebook confrontations and threats.  According to the testimony of Luis Enrique Guzman Rosa (Guzman),[1] he dated Genesis Febriel (Febriel) for about eight to twelve months in 2010.  Sometime after their relationship ended, Guzman received a call from defendant, Febriel's new boyfriend.[2]  During the call, defendant warned Guzman to stop bothering Febriel.  In approximately December 2012, the men encountered each other when

---

[1] Guzman testified that he does not use his full last name, and he introduced himself as Luis Guzman.  Taking our cue from him, we refer to him as Guzman.

[2] During the events leading up to defendant's crimes, Guzman knew defendant only as "Chinito" or "Kelvin Pena," the name defendant used for his Facebook profile.

defendant approached Guzman in a store. After identifying himself, defendant told Guzman: "You know I have my gun up there. And the next time I see you[,] you're going to die." The defendant also told Guzman that, "if [he] was a man, * * * [the two] should find some guns and go to the park and shoot each other."

After this confrontation, defendant repeated his desire to kill Guzman to Guzman's current girlfriend and a friend. The tension escalated when Guzman and defendant took their feud to Facebook, where the two exchanged several messages. At trial, Guzman depicted defendant as the aggressor in these messages: "I would ask him to leave me alone, that I was not looking for trouble. And he said no, that whenever he would see me he was going to kill me." However, the messages were admitted at defendant's trial and reveal that both defendant and Guzman addressed one another menacingly. On February 22, 2013, in response to threats from defendant to Guzman's girlfriend and his friend, Guzman initiated the Facebook messaging by writing to defendant: "Listen kid when you have something to tell me say it to me[.] That I am a real man and I am trying to find out where you live since you threatened to kill me[.] I won't leave it like that." The defendant wrote back:

> "We're going to run into each other on Broad Street and you will see[.] Lucky that I didn't kill you last night rat[.[3]] I would have gone there and you would have been dead for sure but I didn't go so you look bad * * *. [B]ut when I see you[,] you can say bye bye. [Y]our nightmare kid[.]"

Guzman responded:

> "I was ready for you * * *[. Y]ou are all talk[.] I went there to see if you were a real man you rat.

---

[3] Guzman testified that, the night before the commencement of the Facebook messaging, he was at a club or a party and that defendant subsequently learned this fact.

"And there's no need for talking[. L]et's get together so you can see that I'm not all talk * * *.

"You didn't go last night because you were afraid * * *.

"I am your nightmare[. T]hat's why you are like that[. B]ecause [your] girl told you [t]hat she likes thugs like me not like you * * *."

On March 4, 2013, Guzman sent a Facebook message to defendant that read:

"Rat what are you afraid of brother[? Y]ou have my [Facebook.] I told you not to send messages[,] that I'm here and you're lucky that I didn't go pick up your girl when she was calling me to go pick her up because you were sleeping[. I]f I had picked her up I would know where you live and it would have been done[. D]on't threaten[] me[.] I remember she said it was around [D]ouglas."

The defendant responded by proposing that the two "meet up at [CVS] right now to get it over with already." Guzman replied in agreement: "Go ahead come but you won't * * *[.] You think I'm like you * * *[. L]et's get it over with already[.] Bet you won't come * * *." The defendant responded, "I'm on my way there." The two exchanged more messages in rapid succession. Guzman told defendant: "We are going to go head up fist fight [sic][.] I'm almost there[.] I will wipe out the hatred you have towards me[.]"

As the battleground shifted from Facebook to a CVS parking lot on Broad Street in Providence, Guzman obtained a ride to the parking lot from a friend, who drove a Nissan Maxima. The defendant arrived in the parking lot in a vehicle driven by Febriel. Unbeknownst to Guzman, defendant brought a gun to this fistfight. The defendant and Guzman both exited their vehicles, when defendant pulled out a firearm and fired at Guzman. The bullet entered and exited Guzman's arm just above his elbow.[4] After the shot rang out, the car that transported Guzman to CVS pulled away, and Guzman ran from the parking lot in the direction of a public

---

[4] Apparently, the bullet also hit the Nissan Maxima.

housing complex on Prairie Avenue. While running, Guzman felt faint; he headed into a store so that an ambulance could be summoned. Shortly after Guzman entered the store, defendant appeared at the store's entrance. The defendant told Guzman: "You see, I am not playing. That's who I am."[5] The defendant then fled the scene, and, soon thereafter, officers from the Providence Police Department arrived at the store.

A search of the CVS parking lot revealed an area of broken automobile glass and a 9 millimeter shell casing. Later that evening, police discovered a Nissan Maxima on a nearby street. The vehicle had ballistic damage to the passenger side of the hood, and the front passenger window was shattered. Meanwhile, police were able to locate defendant's address, where they apprehended defendant and Febriel on the night of the shooting. A protective sweep of the home revealed neither a firearm nor ammunition, and police never recovered the weapon defendant used to shoot Guzman. Officers did not test defendant for gunshot residue. Although police processed the Nissan Maxima for fingerprints, the efforts proved futile. Police asked Guzman the identity of the driver of the Nissan Maxima on the night of the shooting, but Guzman refused to provide a name. At trial, Guzman testified that he knew the driver as "Shortie" and that he did not know his real name.

The defendant was charged with felony assault with a dangerous weapon (count 1), discharging a firearm while committing a crime of violence (count 2), and carrying a handgun without a license (count 3).[6] On January 3, 2014, defendant, while incarcerated at the Adult

---

[5] Guzman also testified that defendant said: "You see, you see, I am Chinito, mother fucker, and you see what's going to happen."

[6] The defendant was also charged with three additional offenses: discharging a firearm within a compact area; violation of a no-contact order; and conspiracy to commit a felony assault. The state dismissed these counts pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure prior to the commencement of trial.

Correctional Institutions (ACI) awaiting trial on these charges, called Guzman in an attempt to bribe him to refrain from testifying against defendant. A recording of this phone call and a transcript of it were admitted into evidence at defendant's trial. The defendant opened the conversation by telling Guzman: "I am 'Chinito[.]' [H]ey, let's talk you and me. I've got five thousand bucks so you don't go to court." Guzman told defendant, "[D]on't call me with this kinda stuff brother, just let it go." The defendant replied: "Well then, you, [y]ou are not going [to] set foot in? You are not going there?" Guzman responded, "I don't know, don't call me for this kinda shit, brother," and the conversation ended. Despite Guzman's reluctance to discuss the bribe over the phone, he proved to be very interested in the money. In a series of text messages, Guzman implored Febriel to speak with a member of defendant's family in order to collect the $5,000. When informed that it was unlikely that defendant's family would pay up, Guzman responded, "[T]hen they shouldn't be crying when the son gets his 30." Ultimately, Guzman accepted $2,100 from defendant's family, but the attempted bribery failed.

At trial, defendant's theory of the case was that Guzman was shot by someone else, perhaps by Shortie or another occupant of the Nissan Maxima, and that a story was then concocted to pin the blame on defendant so that, with defendant out of the picture, Guzman could reunite with Febriel. The jury rejected this theory and instead found defendant guilty on all counts. The defendant moved for a new trial, arguing that the verdict was contrary to the clear weight of the evidence. The defendant noted certain mistakes in the lead detective's incident report that were corrected by the detective at trial and argued that the police failed to investigate the identity of the person who drove Guzman to CVS on the night of the shooting. The defendant also emphasized that police failed to test him for gunshot residue when they

apprehended him hours after the shooting, and he also noted that the weapon was never found. Finally, defendant contended that Guzman was not a credible witness.

The trial justice denied defendant's motion for a new trial. The trial justice found Guzman—whom he labeled "[t]he key and crucial witness" in this case—to be "a very credible witness"; the trial justice added that, "[F]rom my perspective as a front-row observer, the jury was well[ ]warranted in accepting his testimony." The trial justice also concluded that the jury's guilty verdict was well supported by the threats made by defendant through the Facebook messages and defendant's attempt to bribe Guzman in the hopes of avoiding prosecution. He deemed the discrepancies in the police reports to be "scarcely significant" given the evidence of defendant's guilt. The trial justice was similarly unmoved by Guzman's reluctance to identify the driver of the Nissan Maxima that transported him to the CVS on the night of the shooting. He noted that defense counsel did not ask Guzman to identify the driver, and he emphasized that "Guzman could not have legally persisted in his nondisclosure if pressed by [defense counsel] to identify that person." The trial justice characterized defense counsel's election not to pursue the matter as a tactical decision.

The trial justice sentenced defendant to twenty years on count 1 to be served at the ACI; twenty years on count 2, suspended with probation, to run consecutively to the sentence imposed on count 1; and ten years on count 3, suspended with probation, to be served concurrently with the sentence imposed on count 2. The defendant timely appealed.

**Standard of Review**

A criminal defendant's motion for a new trial can be prosecuted in two ways: one that challenges the sufficiency of the evidence to support the guilty verdict and one that assails the verdict as against the weight of the evidence. State v. Clark, 974 A.2d 558, 569 (R.I. 2009). In

this case, apart from scattered references[7] that might be understood to allege insufficiency of the evidence, the thrust of defendant's argument on appeal is that the verdict was against the weight of the evidence. When confronted with a motion for a new trial claiming that the verdict is against the weight of the evidence, the trial justice must "sit[] as the legendary thirteenth juror." State v. Covington, 69 A.3d 855, 862 (R.I. 2013) (quoting State v. Smith, 39 A.3d 669, 673 (R.I. 2012)). In this capacity, the trial justice must, "in light of the charge to the jury, * * * exercise his or her independent judgment in weighing the evidence and assessing the credibility of the witnesses." Id. (quoting Smith, 39 A.3d at 673). Fulfilling this endeavor is a three-step process: "[t]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Id. at 863 (quoting Smith, 39 A.3d at 673). If, after adhering to this framework, the trial justice reaches the same conclusion as the jury, the inquiry is at an end; "the verdict should be affirmed and the motion for a new trial denied." Id. (quoting Smith, 39 A.3d at 673).

We review a trial justice's ruling on a motion for a new trial deferentially. Covington, 69 A.3d at 863. So long as the trial justice complies with the three-step procedure and articulates adequate reasons for his or her decision, the decision "will be given great weight and left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." Id. (quoting Smith, 39 A.3d at 673). "We employ this deferential standard

---

[7] Despite these isolated references, defendant's brief in this Court sets forth only the standard of review for motions for a new trial concerning the weight of the evidence. Moreover, the record demonstrates—and defendant concedes on appeal—that the new-trial motion below was limited to the argument that the verdict was against the weight of the evidence. In these circumstances, to the extent defendant intended to argue on appeal that the evidence was insufficient, we deem such an argument waived for our review. See State v. Buchanan, 81 A.3d 1119, 1126-27 n.9 (R.I. 2014).

of review because 'a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" State v. Paola, 59 A.3d 99, 104 (R.I. 2013) (quoting State v. Texieira, 944 A.2d 132, 141 (R.I. 2008)).

**Analysis**

The defendant principally argues that the trial justice should have granted his motion for a new trial because Guzman's testimony was not credible. He contends that Guzman's testimony that defendant was the sole aggressor in the months before the shooting is belied by the Facebook messages, which show that Guzman and defendant both exchanged threats. The defendant also points out that the text messages between Guzman and Febriel demonstrate that Guzman sought to capitalize on defendant's $5,000 bribe by pestering Febriel to collect. Finally, defendant notes that Guzman "stubbornly masked" the identity of the person who dropped him off at the CVS in the Nissan Maxima, "thereby ensuring that no one would be available to contradict his testimony."

The defendant faces a steep uphill climb because, "[i]n the mine-run of cases, credibility battles are won or lost in Superior Court," and "[a] defendant's disagreement with a trial justice's credibility determinations 'is not a sufficient basis to warrant the granting of a motion for new trial.'" State v. Pona, 66 A.3d 454, 476 (R.I. 2013) (quoting Paola, 59 A.3d at 104). This Court will not disturb a trial justice's assessment of witness credibility unless it is clearly erroneous or the trial justice "overlooked or misconceived relevant and material evidence." Id. (quoting Paola, 59 A.3d at 104). This deference is grounded in the commonsense notion that, "[b]ecause the trial justice has observed the witnesses testify, he or she is in a better position than this Court to assess their credibility." Id.

This case is no exception. The trial justice considered defendant's argument with respect to Guzman's reluctance to reveal Shortie's true identity, but he was ultimately unpersuaded. He noted that "Guzman could not have legally persisted in his nondisclosure if pressed by [defense counsel] to identify that person"; however, rather than risk another eyewitness to the shooting, defense counsel elected not to press Guzman for that identity. We discern no error in this reasoning or in the trial justice's characterization of defense counsel's election not to pursue the matter as a tactical decision.

The trial justice also sat as a "front-row observer" during Guzman's testimony and the introduction of the Facebook messages, defendant's prison call to Guzman, and the text messages between Guzman and Febriel. Although aspects of Guzman's unsavory character were revealed in the Facebook and text messages, the evidence was also damning for defendant. As the trial justice noted, the Facebook messages "demonstrat[ed] that * * * defendant had been bent on killing Guzman." The trial justice also considered Guzman's receipt of some of the money that defendant promised Guzman, but he chose to place more significance on the fact that defendant attempted to bribe Guzman when "facing certain prosecution" than on Guzman's receipt of a portion of the bribe. The trial justice concluded that, "[p]lainly, the jury was impressed * * * by the abject clarity and brazen comments by * * * defendant that he intended to kill Guzman in his Facebook posting of February 22, and pay him not to testify as recorded in the telephone call, when it was clear that Guzman was going to be produced at trial." The incriminating evidence referenced by the trial justice supported Guzman's story that defendant was the person who shot him. We are not convinced that the trial justice clearly erred or overlooked or misconceived relevant and material evidence in concluding that Guzman was a credible witness.

In a last-ditch effort to stem the tide, the defendant points to perceived shortcomings in the investigation in the aftermath of the shooting. He notes that the Nissan Maxima was never processed, the scene was never reconstructed, ballistic analysis was never performed at the scene or on the Maxima, and, most importantly, no weapon or other incriminating evidence was found when the defendant was apprehended at his home on the night of the shooting. When confronted with this argument, the trial justice concluded that, "[g]iven the defendant's Facebook threat to kill Guzman, and the defendant's blatant attempts to bribe him not to testify, it's hardly surprising that the jury found those other miscues to be of no moment." We agree with the trial justice's reasoning; the Facebook messages, the bribe, and Guzman's testimony constituted ample evidence of the defendant's guilt, even if the police investigation could have produced other incriminating evidence.

**Conclusion**

For these reasons, we conclude that the trial justice did not err in denying the defendant's motion for a new trial. Accordingly, we affirm the judgment of conviction. The papers may be remanded to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        State v. Luis Roldan.

**CASE NO:**        No. 2014-297-C.A.
(P2/14-732AG)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   February 12, 2016

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

        Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

        For State:   Christopher R. Bush
                Department of Attorney General

        For Defendant:  Lara E. Montecalvo
                Office of the Public Defender