June 16, 2021

**Supreme Court**

No. 2019-440-C.A.
(P1/09-1350AG)

State                    :

v.                       :

Miguel Avila.            :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:    opinionanalyst@courts.ri.gov,    of    any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Miguel Avila. | : |

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  This case came before the Supreme Court on May 11, 2021, on appeal by the defendant, Miguel Avila, from a judgment of conviction of first-degree murder after a jury trial.  The defendant argues that the evidence failed to establish beyond a reasonable doubt that the murder of Elio Olivero was premediated and, further, that the state failed to meet its burden of disproving voluntary manslaughter.  Therefore, the defendant contends that the trial justice erred in denying his motion for a new trial.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

### Facts and Travel

It is undisputed that on February 22, 2009, defendant intentionally shot Olivero in the head, killing him.  The facts disclose that at about seven o'clock on

- 1 -

the morning of the murder, defendant appeared at the home of his ex-girlfriend, Diana Lora, a basement apartment located at 530 Union Avenue in Providence, Rhode Island.

The defendant's discovery of a male guest at Lora's home led to this senseless homicide. According to Lora, she and defendant had known each other for approximately two years, and they were in a dating relationship until one to two months before the February 22, 2009 incident.[1] The defendant lived with Lora at Union Avenue in the beginning of their relationship; he eventually moved out, but continued to keep a bureau with clothes and other items in the common area of the basement, outside the door to Lora's apartment.[2] Lora testified that she and defendant had "[m]any problems" during their relationship, and that he was "very violent," and told her, "If I see you doing something, * * * I'm going to kill you." Lora's best friend, Mariubis Santana, testified that approximately six months earlier, during a conversation with defendant at a family reunion "at the Loras' house[,]" defendant told her that "if he ever br[oke] up with [Lora], he wouldn't give up, if she got another guy that he would kill the guy."

---

[1] The defendant told police that Lora had told him that "she needed a break" five days prior to the February 22, 2009 incident. However, Lora and two of her friends testified that the couple had broken up one to two months before the murder.

[2] Lora testified that the door to her apartment led to another room in the basement where the electrical breakers were located. She testified that anyone in the apartment building could access this utility room.

The defendant carried out this threat on February 22, 2009. According to Lora, Olivero gave her a ride home from work in the early morning hours, and she and Olivero were in the basement apartment from approximately 4 a.m. until 7 a.m., when it was time for Olivero to leave for work. When she opened the door to the apartment, defendant was at the doorway. The defendant admitted to police that he had been waiting "outside the basement door" listening to the two voices in the apartment for approximately fifteen minutes before Lora opened the door. Lora testified that when she opened the door, Olivero asked who the man standing there was. Lora introduced Olivero to defendant, who then suggested that they all go inside the apartment to talk.

Once inside, defendant slapped Lora across the face. The defendant told Olivero that he and Lora had only recently broken up, to which Olivero responded with indifference. Lora then told Olivero to call the police. The 911 call reveals that Olivero called the police and relayed that "we got a situation here." After Olivero communicated Lora's address to the dispatcher, defendant asked Lora, "You're going to let him call the police on me?" Lora responded, "Yes, because you hit me[,]" and she told him, "Miguel, leave because the police is going to come."

Lora testified that at that point defendant turned and walked down the hallway as if he was going to leave the apartment. However, defendant was

actually feigning his departure; he later admitted to police that he exited Lora's apartment to access his bureau in the common utility room, to retrieve a firearm. When defendant returned to the living room with the gun, he approached Olivero and positioned the weapon against Olivero's head. Lora testified that Olivero pleaded with defendant to talk to him, but defendant shot him once in the head. The defendant admitted to the police that he was in the apartment for approximately four to five minutes with the gun before he pulled the trigger.

After defendant shot Olivero, Lora ran into another room of the apartment; defendant followed her, with the gun still in hand. Lora testified that while she was screaming at defendant to "calm down," the police began knocking on the exterior door of the apartment building. The defendant told Lora "to be quiet" and that she "had to do whatever he said." Lora testified that the police knocked on the door for about a minute or two, and then left.[3] Lora and defendant remained in the apartment for approximately ten minutes thereafter, until defendant announced that they "had to leave." Lora and defendant proceeded to his car, and defendant began

---

[3] A patrol officer who responded to 530 Union Avenue testified that she received the dispatch call at approximately 7:13 a.m. and responded to the apartment building "within a minute." Police officers checked both the front and back doors, which were locked, and rang the doorbell and banged on the door a few times. Upon receiving no answer, the officers returned to their vehicles. One officer waited outside the building for approximately three to four minutes and was not flagged down by anyone and did not see anyone leave the apartment building. The officer cleared the call because "no one approached [police and they] couldn't gain access into the house[.]"

driving around for approximately two hours, during which time he made several phone calls to Lora's family and friends. Ms. Santana testified that she spoke with defendant on the phone several times that morning and that he told her, "I shot the guy once in the head because I knew that he was going to die quickly."

Eventually, defendant stopped the car in a parking lot at 266 Adelaide Avenue in Providence. The first police officer to locate the vehicle blocked the only exit; and, after defendant attempted to back up towards the exit and came bumper to bumper with the police vehicle, defendant retreated into the parking lot. At some point, Lora was able to jump out of the vehicle and safely reach the officers. After a near hour-long standoff, defendant was taken into custody. As he was transported to the police station, defendant spontaneously stated to an officer, "F* * *, I can't believe I killed him and I did this."

At police headquarters, defendant was advised of his rights and initialed and signed a form indicating that he understood each right. The defendant proceeded to disclose what had transpired that morning. The defendant admitted that he had retrieved a gun from the hallway bureau, reentered the apartment, and proceeded to confront Lora and engage in a dispute with Olivero. The defendant told police that he then shot Olivero, who fell to the floor.[4]

---

[4] The defendant provided police with discordant accounts of how he came to possess the gun. He admitted that it was his gun and that he bought the weapon

On February 23, 2009, the assistant medical examiner performed an autopsy on Olivero. His report disclosed that the spring rod of the firearm used to kill Olivero left an imprint on Olivero's temple, indicating that the firearm was in direct contact with—and pushed against—Olivero's head when it was fired. The report opined that Olivero "died as a result of [g]unshot wound of the head[,]" and ruled that the manner of death was homicide.

A grand jury returned an indictment charging defendant with seven counts, including first-degree murder, various weapons charges, assault, and kidnapping. Prior to trial, and pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure, the state dismissed the counts charging defendant with assaulting Lora and entering her apartment with the intent to commit murder. A jury convicted defendant of murder in the first degree, unlawfully using a firearm during a crime of violence, kidnapping, and unlawfully carrying a firearm.[5] The defendant's motion for a new trial was denied, and the trial justice sentenced him to a mandatory term of life imprisonment at the Adult Correctional Institutions for first-degree murder; a mandatory consecutive term of life imprisonment for discharging a firearm during the murder; an additional twenty-year sentence at the ACI for the kidnapping, to be served concurrently with the life sentence imposed for murder;

"off the streets." However, at one point defendant told police that "he had it for a week; and another time he stated he had it for six to seven months."

[5] The jury found defendant not guilty of assaulting Lora with a dangerous weapon.

- 6 -

and a ten-year sentence at the ACI for unlawfully carrying a firearm, to be served concurrently with the sentence imposed for kidnapping.

The defendant timely appealed to this Court.[6]  On appeal, defendant advances a single claim—that the trial justice erred in denying his motion for a new trial.

## Standard of Review

"When a trial justice considers a motion for a new trial, he or she acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Phillips*, 244 A.3d 897, 903 (R.I. 2021) (quoting *State v. Perkins*, 966 A.2d 1257, 1260 (R.I. 2009)).  The trial justice is tasked with "(1) consider[ing] the evidence in light of the jury charge, (2) independently assess[ing] the credibility of the witnesses and the weight of the evidence, and then (3) determin[ing] whether he or she would have reached a result different from that reached by the jury." *Id.* (quoting *State v. Paola*, 59 A.3d 99, 104 (R.I. 2013)).  "If, after conducting such a review, the trial justice reaches the

[6] The defendant timely filed a notice of appeal on August 14, 2009.  However, it appears from the record that the transcripts of the proceedings before the Superior Court were not ordered by his court-appointed attorney, even though the notice of appeal indicated that transcripts would be ordered.  This precluded the transmittal of the record to this Court.  Nearly ten years later, defendant was found to be eligible for representation by the Office of the Public Defender; the transcripts were ordered, and the appeal was perfected.

same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." *Id.* (quoting *Paola*, 59 A.3d at 104).

As we have frequently noted, "a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Paola*, 59 A.3d at 104 (quoting *State v. Texieira*, 944 A.2d 132, 141 (R.I. 2008)). As such, "this Court accords great weight to a trial justice's ruling on a motion for a new trial, provided that he or she has 'articulated an adequate rationale for denying a motion.'" *Perkins*, 966 A.2d at 1260 (quoting *State v. Cerda*, 957 A.2d 382, 385-86 (R.I. 2008)). The "trial justice's determination will therefore be left undisturbed unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." *Phillips*, 244 A.3d at 903 (quoting *State v. Baptista*, 79 A.3d 24, 29 (R.I. 2013)).

## Analysis

The defendant argues that the trial justice erred in denying his motion for a new trial because, he contends, the evidence was not legally sufficient to support the jury's verdict. Specifically, defendant submits that the evidence supported a verdict of voluntary manslaughter, the trial justice failed to consider whether the state disproved voluntary manslaughter beyond a reasonable doubt, and the trial justice erred by finding that the evidence supported a finding of premeditation.

After careful review of the record, we are satisfied that the trial justice carefully performed the required analysis and set forth an adequate rationale for denying defendant's motion for a new trial. The jury found sufficient evidence to convict defendant of first-degree murder, and the trial justice agreed with this verdict. The trial justice stated:

> "This defendant arrived in her apartment unarmed, but admitted, after discovering Elio Olivero's presence, he strode purposefully down the hallway, directly to a bureau where he stashed a handgun. After retrieving it, he turned around, walked back up the hallway, confronted Olivero, pressed the muzzle of the firearm against Olivero's temple and shot him. He pushed the weapon so forcefully against Olivero's head that post-mortem photographs showed the imprint of the gun muzzle, as well as the so-called spring rod virtually tattooed into Olivero's skin. Moreover, the head shot was no randomly-selected target on Olivero's body.
>
> "Afterwards, while in the car with Diana Lora, the defendant told Mariubis Santana that he had shot Olivero in the head so that he would die, plainly activity [*sic*] reflecting malice.
>
> "Furthermore, the defendant had steadfastly held the intent to kill any paramour of Diana Lora. And, at a family gathering the previous fall, Mariubis Santana heard the defendant say that if Diana ever dated another man, if she broke up with him, he would kill the other man. Santana testified that she had heard the defendant express that same intent to kill on prior occasions as well.
>
> "Even though Diana and the defendant had broken up, the defendant felt that she was cheating on him, and, indeed, he expressed that very sentiment to Officer Jose Deschamps at the police station.

> "Thus, in the face of that evidence, all of which I find to be credible, it's little wonder that the jury convicted the defendant of first-degree murder * * *.

> "Voluntary manslaughter under those circumstances came in a very, very distant third, if at all, and certainly was subsumed by the verdict that was properly rendered by this jury."

Before this Court, defendant appears to suggest that the trial justice—when ruling on a motion for a new trial—was required to perform a discrete analysis as to whether defendant acted in the heat of passion arising from adequate provocation. This contention is not supported by our jurisprudence. The three-step analysis required for passing on a motion for a new trial is well settled; and, if after performing this analysis, "the trial justice agrees with the jury's verdict, the inquiry is complete and the motion for a new trial should be denied." *State v. Staffier*, 21 A.3d 287, 290 (R.I. 2011).

In the case at bar, the trial justice performed the requisite three-step analysis by independently evaluating the evidence in light of his charge to the jury and by weighing the credibility of the witnesses. The trial justice articulated his reasons for finding that there was sufficient evidence to convict defendant of first-degree murder, and he concluded that he would have decided the case as the jury did. Once the trial justice determined that the jury was justified in finding defendant guilty of first-degree murder and that he agreed with the verdict, his inquiry was complete, and defendant's motion for a new trial was properly denied. The trial

justice was not obligated to perform a separate analysis of the lesser-included offenses, including voluntary manslaughter.

Indeed, this Court has recognized that "[t]he distinguishing factor between murder and manslaughter is the presence or absence of malice aforethought." *State v. Garcia*, 883 A.2d 1131, 1137 (R.I. 2005). By finding defendant guilty of first-degree murder, the jury evidenced its conclusion that defendant killed Olivero with malice aforethought; the trial justice agreed with this conclusion, and the record clearly demonstrates sufficient evidence to support a conviction for first-degree murder.

This was an execution by a jealous ex-lover. The defendant feigned his departure from the apartment only to proceed down "a very long hallway" to retrieve a gun from his bureau. Upon obtaining the murder weapon, defendant reentered the apartment and placed the gun against Olivero's head. Olivero pleaded for his life, saying several times, "My brother, my brother, let's talk[.]" The defendant held the gun to Olivero's head for a period of time—possibly four to five minutes—before he fired a single shot. The gun was positioned against the decedent's temple with such force and duration as to leave an "imprint" that was visible in postmortem photographs.

After the murder, defendant declared, "I shot the guy once in the head because I knew that he was going to die quickly." All of this evidence, taken

together, establishes sufficient proof to justify a finding that malice aforethought existed for more than a mere moment. *See State v. McMaugh*, 512 A.2d 824, 829-30 (R.I. 1986) (holding that circumstantial evidence regarding the degree of premeditation "should be afforded equal weight with direct evidence").

After carefully reviewing the record before us, we are of the opinion that the trial justice did not overlook or misconceive any material evidence. The trial justice undertook a careful analysis of the evidence and the credibility of the witnesses, and he correctly found that the proof in this case was sufficient to support the verdict. Accordingly, we perceive no error in the trial justice's denial of the motion for a new trial.

## Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court. The papers in the case may be remanded to the Superior Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Miguel Avila. |
| **Case Number** | No. 2019-440-C.A. (P1/09-1350AG) |
| **Date Opinion Filed** | June 16, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General<br>For Defendant:<br><br>Kara J. Maguire<br>Office of the Public Defender |